UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE S. DEPPEN, on behalf of
Herself and all similarly situated persons,

      Plaintiff and Counter-Defendant,

-v-

THE DETROIT MEDICAL CENTER,
a Michigan non-profit corporation,

      Defendant and Counter-Plaintiff.

CASE NO.:  2:10-cv-12229-GCS-MAR
Hon. George Caram Steeh

_____/

**ASKER PERLMUTER PLC**
Paul P. Asker (P45098)
Jessica Dopierala Hite (P72113)
Attorneys for Plaintiff/Counter-Defendant
32000 Northwestern Highway
Suite 275
Farmington Hills, MI  48334
(248) 419-5400
pasker@attorneyclientsolutions.com
jhite@attorneyclientsolutions.com

**DETROIT MEDICAL CENTER,
LEGAL AFFAIRS**
Charles N. Raimi (P29746)
Deputy General Counsel
Attorney for Defendant/Counter-Plaintiff
4707 St. Antoine, Suite W514
Detroit, Michigan 48201
(313) 966-2226
craimi@dmc.org

**DETROIT MEDICAL CENTER'S
MOTION FOR SUMMARY JUDGMENT**

Detroit Medical Center, pursuant to Fed.R.Civ.P. 56(b), and for the reasons stated in the accompanying brief, moves for summary judgment dismissing plaintiff's complaint with prejudice.

Detroit Medical Center (DMC) has asserted a counterclaim.  However, if the Court dismisses plaintiff's complaint, DMC will consent to dismissal of its counterclaim so as to bring this matter to conclusion.  However, DMC reserves the right to seek costs and attorney fees in the event there are legally proper grounds for pursuing such a recovery.

DETROIT MEDICAL CENTER,
LEGAL AFFAIRS

By:   /s/ Charles N. Raimi
Charles N. Raimi (P29746)
Deputy General Counsel
Attorney for Defendant/Counter-Plaintiff
4707 St. Antoine, Suite W514
Detroit, Michigan 48201
(313) 966-2226
craimi@dmc.org

Dated:  February 1, 2011

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE S. DEPPEN, on behalf of
Herself and all similarly situated persons,

      Plaintiff and Counter-Defendant,         CASE NO.:  2:10-cv-12229-GCS-MAR
                                        Hon. George Caram Steeh

-v-

THE DETROIT MEDICAL CENTER,
a Michigan non-profit corporation,

      Defendant and Counter-Plaintiff.

_____/

**DETROIT MEDICAL CENTER'S**
**BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

DETROIT MEDICAL CENTER,
LEGAL AFFAIRS

By:  Charles N. Raimi (P29746)
     Deputy General Counsel
     Attorney for Defendant/Counter-Plaintiff
     4707 St. Antoine
     Suite W514
     Detroit, MI  48201
     (313) 966-2226
     craimi@dmc.org

February 1, 2011

## TABLE OF CONTENTS

ISSUES AND CONTROLLING LAW ............................................................................ iii

INTRODUCTION ..................................................................................................................1

FACTS ....................................................................................................................................2

    A.   CRNAs are in great demand in the marketplace....................................................2

    B.   Harper University Hospital and Hutzel Women's Hospital surgical facilities ............3

    C.   CRNA standard shift times ..........................................................................................4

    D.   DMC provides ample anesthesia staffing for Hutzel OB/Gyn services,
          to ensure proper patient care and CRNAs' ability to take meal breaks ........................4

    E.   CRNAs maintained their own timesheets on the "honor system" ...............................6

    F.   Deppen's time recording practices...............................................................................7

    G.   Deppen was paid for all hours claimed on her time sheets..........................................8

    H.   CRNAs received full pay for early starts or late exits; Deppen never
          made such a claim .....................................................................................................10

    I.   Deppen's history of problems ....................................................................................11

    J.   The master spreadsheet of Deppen's activities shows that Deppen routinely
          arrived late for her shifts, or left early, but nevertheless claimed full pay ................12

    K.   Deppen received her 30-minute meal breaks, and routinely much more ...................16

    L.   Overwhelming independent evidence confirms that (i) Deppen routinely took
          breaks of 30 minutes or more, and (ii) Shepard had every reason to believe
          Deppen was receiving her meal breaks, and more......................................................20

    M.   Deppen's deposition testimony ..................................................................................23

    N.   Deppen's conduct at DMC, namely, regularly arriving late and leaving early,
          and regularly sleeping for large blocks of time, enabled Deppen to carry on
          her DMC job and two demanding non-DMC jobs ....................................................26

PROCEDURAL BACKGROUND...........................................................................................29

ARGUMENT ..................................................................................................................29

I.    SUMMARY JUDGMENT STANDARD.................................................................29

II.   DEPPEN'S FLSA CLAIM SHOULD BE DISMISSED...........................................30

      A.    Controlling legal principles...............................................................30

            1.    An FLSA plaintiff has the burden of proving (i) that she
                  performed overtime work for which she was not properly
                  compensated, and (ii) that the employer knew or should
                  have known of the overtime work ...........................................30

            2.    Provided an FLSA plaintiff does not spend her break time
                  "predominantly for the employer's benefit," meal breaks are
                  not compensable.......................................................................32

            3.    An FLSA plaintiff is not entitled to a windfall recovery at the
                  employer's expense...................................................................34

      B.    Deppen's FLSA claim should be dismissed ........................................34

            1.    Deppen cannot present evidence that she worked overtime
                  but was not compensated ..........................................................34

            2.    Deppen was paid for every hour she reported on her time sheets,
                  and DMC had no reason to believe that Deppen was not reporting
                  all hours worked........................................................................37

            3.    Any award for Deppen would represent a windfall recovery
                  at DMC's expense ....................................................................37

III.  DEPPEN'S MICHIGAN STATUTORY CLAIM SHOULD BE DISMISSED ......38

IV.   DEPPEN'S CLAIM FOR "FAILURE TO MAINTAIN RECORDS"
      SHOULD BE DISMISSED ...................................................................................38

V.    DEPPEN'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED .........39

CONCLUSION AND RELIEF.....................................................................................39

<u>**ISSUES AND CONTROLLING LAW**</u>

1.   <u>**Fair Labor Standards Act.**</u>   Where (i) DMC paid plaintiff for all hours that plaintiff reported on time sheets plaintiff herself maintained on the "honor system," (ii) overwhelming evidence shows that plaintiff worked far fewer hours than she reported, and (iii) DMC had no actual or constructive knowledge of any additional time worked by plaintiff but not reported on her time sheets and, to the contrary, DMC had every reason to believe that plaintiff was paid for all time worked; should the Court dismiss plaintiff's claim for overtime under the Fair Labor Standards Act?

DMC says yes.

**Controlling law:**

*Wood v. Mid-America Management Corp.*, 192 Fed.Appx. 378, 2006 WL 2188706 (6th Cir.), ex. 27 (plaintiff in an FLSA case has the burden of proving (i) she performed overtime work for which she was not properly compensated, and (ii) the employer knew or should have known of the overtime work).

*Myracle v. General Electric Company*, 33 F.3d. 55, 1994 WL 456769 (6th Cir.), ex. 24 (provided an employee does not spend his or her meal break time "predominantly for the employer's benefit," meal breaks are not compensable).

*Lupien v. City of Marlborough*, 387 F.3d 83 (1st Cir. 2004), (an FLSA plaintiff is not entitled to a windfall recovery at the employer's expense).

2.

**Michigan Wages and Fringe Benefits Act.** Should plaintiff's claim under the Michigan Wages and Fringe Benefits Act be dismissed because (i) the Act on its face does not apply to this lawsuit, (ii) Deppen failed to exhaust her administrative remedies, and (iii) Deppen was overpaid, not underpaid?

       DMC says yes.

**Controlling law:**

M.C.L.A. 408.472, M.C.L.A. 408.477, ex. 19 (statutes on their face do not apply to plaintiff's claims in this lawsuit).

*Jackson v. Wal-Mart*, 2005 WL 3191394 (Mich.App.), ex. 23 (M.C.L.A. 408.472 and M.C.L.A. 408.477 do not apply to claims such as those asserted by plaintiff in this lawsuit).

*Ayres v. Balousek*, 2005 WL 2033527 (E.D.Mich.), ex. 21 (Deppen's claim fails because she did not pursue administrative remedies).

    **3.**    **Failure to maintain records.** Should plaintiff's claim for "failure to maintain records," asserted under the FLSA, be dismissed because (i) there is no private right of action for such a claim, and (ii) DMC properly maintained records?

       DMC says yes.

**Controlling law:**

*Elwell v. University Hospitals*, 276 F.3d 832 (6th Cir. 2002), (no private right of action available to enforce 29 U.S.C. § 211(c)).

iv

**4.**    **<u>Unjust enrichment.</u>**    Should plaintiff's unjust enrichment claim, which is premised exclusively on Deppen's allegation that DMC violated the FLSA and the Michigan Wages and Fringe Benefit Act, be dismissed because (i) DMC did not violate either the FLSA or the Michigan Wages and Fringe Benefits Act, and (ii) Deppen was overpaid, not underpaid?

DMC says yes.

**Controlling law:**

Dismissal of Deppen's FLSA and MWFBA claims would require dismissal of Deppen's unjust enrichment claim, which is premised entirely on the theory that DMC violated the cited laws.

*See* <u>*also*</u>:

*Anderson v. Sara Lee Corporation*, 508 F.3d 181 (4th Cir. 2007), (state common law claims premised on defendant's alleged breach of the FLSA are preempted).

## **INTRODUCTION**

Denise Deppen, in 1993, was hired by Detroit Medical Center (DMC) as a certified registered nurse anesthetist (CRNA).  Deppen worked continuously at DMC's Hutzel Women's Hospital providing CRNA services for OB/Gyn procedures.

In February 2010, following complaints from medical residents, DMC conducted an investigation of CRNAs working at DMC's Harper Hospital and Hutzel Women's Hospital.  The investigation revealed that eight CRNAs, including Deppen, had been collecting pay for time not worked based on falsified time records.  Deppen promptly resigned her employment.

In June 2010 Deppen sued DMC alleging, *inter alia*, that DMC had failed to pay her for all hours worked.  It is uncontested that DMC paid Deppen for every hour claimed on the time sheets Deppen herself maintained.  Deppen never once complained about not being properly paid, and DMC had no reason on earth to suspect that Deppen was working "overtime" without compensation.  She was not.

Discovery has revealed that Deppen, at all relevant times, was working three jobs – CRNA at DMC, CRNA at Oakland Regional Hospital, and single parent to two minor children.  In 2009, Deppen earned $211,480 from Oakland Regional Hospital and $163,250 from DMC – for a total of $374,730.  Deppen was able to carry on these three demanding jobs by routinely arriving late to, and leaving early from, her DMC shifts – but nevertheless claiming pay for a full shift.  Deppen also regularly arrived exhausted at the DMC.  Because she had substantial downtime during her shifts, Deppen was able to sleep through her meal breaks and during other large blocks of time.

Deppen was regularly overpaid, and never underpaid.  Deppen's lawsuit is fundamentally unsound and should be dismissed.

## FACTS

### A.   CRNAs are in great demand in the marketplace.

A certified registered nurse anesthetist (CRNA) is an "advanced practice" nurse, specializing in anesthesia. To become a CRNA one must first become a registered nurse ("RN"). An RN must take special training and pass a certification exam to become a CRNA. At the DMC, CRNAs work under the medical supervision of an anesthesiologist who is a licensed physician. Shepard dec'l, ex. 1, ¶ 4.[1]

For many years there has been a serious shortage of both registered nurses and, even more so, CRNAs. There are too few educational training slots to educate enough RNs and CRNAs to accommodate the demand. Shepard dec'l, ex. 1, ¶ 7.

As a result of the shortage CRNAs have at all relevant times been in great demand. CRNA jobs are plentiful and easy to find at hospitals, ambulatory surgical centers, teaching positions and elsewhere. Employers, to attract and retain CRNAs, offer high pay, excellent benefits, flexible scheduling and otherwise do everything reasonably possible to accommodate CRNAs. Shepard dec'l, ex. 1, ¶ 8. Deppen received $76.42 per hour; "shift premiums" (extra pay) for afternoon and midnight shifts; extensive "executive level" benefits; and overtime as applicable. _Id_, ¶ 9.[2]

Perhaps as a result of CRNAs being in such great demand, or perhaps as a result of CRNAs being highly educated, highly paid professionals, CRNAs under Shepard's supervision (including Denise Deppen) have never hesitated to come to Shepard with any problems, issues or

---

[1] **Laura Shepard** is a CRNA and director of anesthesia services at DMC's Harper and Hutzel Hospitals. Shepard has been Deppen's supervisor since Shepard joined DMC in November 2005. Shepard has extensive experience in providing CRNA services, including CRNA services to OB/Gyn patients. Ex. 1, ¶¶ 1-6.

[2] CRNAs, as highly paid professionals, can be classified as salaried and exempt from the Fair Labor Standards Act (FLSA). _Cavanaugh v. Southern California Permanente Medical Group, Inc._, 583 F.Supp.2d 1109 (C.D.Cal. 2008). Due to competitive pressures in the marketplace, DMC classifies CRNAs as hourly employees. Shepard dec'l, ex. 1, ¶ 8.

concerns about their jobs, pay or benefits.  However, at no time did Deppen or any other CRNA complain to Shepard about any of the issues raised in this lawsuit.  *Id*, ¶ 10.

**B.**   **Harper University Hospital and Hutzel Women's Hospital surgical facilities.**

DMC's Harper University Hospital and Hutzel Women's Hospital are located within the same large building complex that also includes (at its north end) the Karmanos Cancer Center. Shepard dec'l, ex. 1, ¶ 11, and ex. B (map of DMC's central campus).  DMC's Harper University Hospital is a comprehensive, tertiary care hospital.  Harper Hospital has more than 25 operating rooms in which a wide variety of surgical procedures are performed.  Most of the Harper Hospital operating rooms are on the lower ground level of the Harper/Hutzel complex. Shepard's office also is located on the lower ground level of Harper Hospital, in direct proximity to the majority of the Harper Hospital operating rooms.  *Id*, ¶¶ 12-13.

DMC's Hutzel Women's Hospital (where Deppen worked) specializes in OB/Gyn services and provides care primarily to indigent women having either no health insurance or who are enrolled in Medicaid.  The Hutzel Women's Hospital OB/Gyn patient rooms and operating rooms are located on the third floor of the Harper/Hutzel complex.  *Id*, ¶ 14.

An anesthesia resident is a licensed doctor who has successfully graduated from medical school, and is receiving specialized training in anesthesiology.  CRNAs, anesthesia residents and attending physicians (anesthesiologists) are collectively referred to as "anesthesia providers." There is a sizeable room located on the third floor of the Harper/Hutzel building, in the OB/Gyn area, where Hutzel OB/Gyn anesthesia providers can relax when they are not performing patient duties (the "OB/Gyn Anesthesia Room").  CRNAs working in the Hutzel OB/Gyn area can use the OB/Gyn Anesthesia Room to eat, rest, sleep or attend to personal matters.  Within the large OB/Gyn Anesthesia Room there are two smaller private rooms with couches, each of which has

a door that can be closed for privacy, where a CRNA can lie down and rest or sleep.  *Id*, ¶¶ 15, 26.

**C.    CRNA standard shift times.**

CRNA services at Harper and Hutzel are needed 7 days a week, 24 hours a day.  Standard shift times at Harper/Hutzel, both for CRNAs and registered nurses working clinical shifts, have at all times been as follows:

"Shift 1" (day shift):   7:00am – 3:30pm

"Shift 2" (afternoon):  3:00pm – 11:30pm

"Shift 3" (midnight):   11:00pm – 7:30am

Hutzel OB/Gyn CRNA schedules identify shifts by "shift 1," "shift 2" and "shift 3."  *Id*, ¶ 16.

The end time of each shift overlaps by one-half hour with the beginning time of the next shift.  The one-half hour overlap is necessary to ensure proper patient care.  A CRNA coming on a shift needs time with the departing CRNA to orient to what is happening with the patients (called "giving report").  *Id*, ¶ 17.  Standard shift times are known to all CRNAs.  *Id*, ¶¶ 17-18; and *see* the declaration of Qingyun Ruan, CRNA, ex. 2, ¶¶ 7-8.[3]  The one-half hour overlap, resulting in shift end times falling on the half-hour, is, DMC believes, standard industry practice. *Id*, ¶ 18.

**D.    DMC provides ample anesthesia staffing for Hutzel OB/Gyn services, to ensure proper patient care and CRNAs' ability to take meal breaks.**

Anesthesia services at Harper and Hutzel differ in certain respects.  For Harper, the vast majority of surgical procedures (cancer surgeries, heart surgeries, etc.) are scheduled in advance. 40 or so CRNAs regularly work at Harper Hospital, to support the surgical activities in Harper's 25 operating rooms.

---

[3] **Qingyun Ruan** is an experienced CRNA who regularly worked in Hutzel OB/Gyn from 2006 to date.

For Hutzel, some procedures are scheduled in advance, but in most cases it is not possible to know when a patient will come to the hospital in labor, or when a patient will deliver the baby. Likewise, it is not possible to know in advance whether a patient will need an epidural or C-Section. _Id_, ¶ 20. Accordingly, whereas staffing for Harper will fluctuate depending upon the day of the week and scheduled work load, Hutzel has the same core staffing every day. _Id_, ¶ 21.

The "Relevant Period" in this case is June 2008 – February 2010.[4] During that time there were 13 Harper/Hutzel CRNAs who provided service in Hutzel OB/Gyn, although not all of those CRNAs were primarily assigned to OB. _Id_, ¶ 22.

The vast majority of a CRNA's duties while working in Hutzel OB/Gyn relate to epidurals, C-Sections, and various supporting activities relating to those procedures. DMC, in the ordinary course of business, regularly compiles statistics on the number of procedures performed in the Hutzel OB/Gyn area. _Id_, ¶ 23. Those statistics show as follows (_id_, ¶ 24):

- Average number of epidurals per 8-hour shift:  3.16 for 2008 and 3.13 for 2009.
- Average number of C-Sections per 8-hour shift:  1.37 for 2008 and 1.49 for 2009.

The following anesthesia providers provide the "core staffing" in the Hutzel OB/Gyn area (_id_, ¶ 25):

- <u>Day shift:</u>  Two CRNAs, one and sometimes two anesthesia residents and an attending anesthesiologist.

- <u>Afternoon shift:</u>  Two CRNAs and an attending anesthesiologist; an anesthesia resident also provides service for part of the shift.

- <u>Midnight shift:</u>  One CRNA, a team of two anesthesiology residents, one senior and one junior, and an attending anesthesiologist.

Both CRNAs and anesthesia residents work under the clinical supervision of an attending anesthesiologist. An anesthesiologist is able to supervise more than one procedure at a time

---

[4] Deppen left the DMC in February 2010 and filed suit in June 2010. The normal FLSA statute of limitations is two years, hence, the "Relevant Period" is June 2008 – February 2010.

where the anesthesiologist is being assisted by CRNA(s) and/or anesthesia resident(s).  CRNAs and anesthesia residents equitably share the work load.  *Id*, ¶ 26.

Shepard determines Hutzel CRNA staffing based upon the cited statistics, the CRNAs' estimated time commitments associated with those procedures and related duties, Shepard's personal observations, interactions and discussions with CRNAs and others working in the OB area (RNs, residents and attending physicians), and Shepard's years of experience of providing CRNA services for OB/Gyn activities and in supervising such activities.  Shepard's professional opinion is that the staffing in the OB area is fully adequate to handle the case load and allow CRNAs to take at least a 30-minute uninterrupted meal break during their shift.  Shepard's opinion is overwhelmingly confirmed by the record in this case.  *Id*, ¶ 27; and *see* fact sections J, K and L below.

### E.   CRNAs maintained their own time sheets on the "honor system."

From the date Shepard joined the DMC in 2005, and throughout the Relevant Period, Harper/Hutzel CRNAs recorded their own time on time sheets like those appended as ex. E to Shepard's declaration.  CRNA timekeeping operated on the "honor system;" DMC trusted the CRNAs, as highly paid professionals, to properly record their time.  *Id*, ¶¶ 28-29 and ex. E; and *see* Deppen's deposition, ex. 12, pp. 85-86.

For each work day, the CRNA recorded his or her "time in," "time out," and "total hours worked."  For example, the May 6, 2009 time sheet for OB/Gyn CRNA Jeanene Adams, shows that Adams began work at 7:00am and left work at "15:30," i.e., 3:30pm.  The total time between 7:00am and 3:30pm is 8.5 hours.  Adams recorded 8 hours as "total hours worked," reflecting her one-half hour uncompensated meal break.  *Id*, ¶ 30 and ex. E, p.1 (Adams' time sheet).

The DMC's meal break policy was in place since before Shepard joined the DMC in 2005. All hourly employees working a shift longer than 5 hours are allowed a one-half hour uncompensated meal break. Time permitting, employees also receive a 15-minute compensated break every four hours. *Id*, ¶ 31 and ex. F (copies of policy).

The DMC's meal break policy has at all times been posted on the DMC's intranet web page easily accessible by all DMC employees. The policy's provisions are common knowledge among Harper/Hutzel CRNAs. *Id*, ¶ 32; and Ruan dec'l, ex. 2, ¶ 14.

CRNAs often work shifts longer than 8 hours; *i.e.*, 16 or 24-hour shifts. During those longer shifts only one-half hour is deducted for a meal break no matter how many breaks are taken or how long they may be. *Id, ¶* 33 and ex. E. For example, on April 20, 2009, CRNA John Cox recorded his "time in" as 0700 (i.e., 7:00am) and his "time out" as 2330 (i.e., 11:30pm). That is 16½ hours. After deducting one, one-half hour meal break, Cox reported "total hours worked" as 16 hours. *Id*, *¶* 34 and ex. E, p. 7.

**F.     Deppen's time recording practices.**

Standard shift times end on the half-hour; i.e., 3:30pm (day shift), 11:30pm (afternoon shift), 7:30am (midnight shift). The vast majority of the roughly 50 CRNAs working under Shepard's supervision at Harper/Hutzel properly recorded their time to the half-hour. *Id*, *¶* 35. The 35-40 CRNAs who worked primarily at Harper all regularly recorded their time to the half-hour. Shepard dec'l, ex. 1, ¶ 38 and ex. H.

Of the 13 CRNAs who, during the Relevant Period, worked in Hutzel OB/Gyn, all except three routinely recorded their time to the half hour. The three CRNAs who did not record their time in that fashion were:  Denise Deppen, Lori Szydlowski and Kim Britt. Their time sheets show an end time on the hour (3:00pm, 11:00pm or 7:00am). *Id*, ¶ 36 and ex. E, pp. 3-4, 11-12,

21-22.[5]

Deppen joined the DMC in 1993 and worked in the OB/Gyn area from that date until she resigned in February 2010.  CRNAs who worked along side of Denise Deppen in OB/Gyn, and whose shifts ended at the same time, recorded their shift end time to the half-hour.  Shepard dec'l, ex. 1, ¶ 37 and ex. G (collecting representative examples from 2008-2009).

Deppen's understanding, according to her deposition testimony, was that shifts ran to the hour (i.e., 3:00pm for a day shift).  Deppen claimed to be unaware that other CRNAs reported shift times to the half-hour, despite admitting that all time sheets for OB/Gyn CRNAs could be viewed by the other CRNAs.  Deppen dep., ex. 12, pp. 56-57, 88-94.  Deppen also testified she had no knowledge whatever of DMC's meal break policy.  Deppen dep., ex. 12, pp. 63-64.

It is inconceivable to Shepard that any experienced Harper/Hutzel CRNA, such as Denise Deppen who had worked at the DMC since 1993, would not be aware of the standard shift hours (running to the half-hour), or of DMC's meal break policy.  Accordingly, Shepard interpreted Deppen's shift ending times (and those of the two other OB CRNAs who recorded their time in similar fashion) as "shorthand," referring to the correct shift end time.  Shepard reported Deppen's time to payroll in that fashion, to ensure Deppen received full payment for the "total hours" claimed on her time sheets.  It never occurred to Shepard that Deppen was not aware of DMC's policies and standard shift hours.  _Id_, ¶ 39.

### G.   Deppen was paid for all hours claimed on her time sheets.

In July 2008, DMC, and Harper/Hutzel Hospital, implemented the Kronos timekeeping system.   Under that system most hourly employees, including registered nurses, began electronically "punching in and out" to record the precise times they began and ended their

---

[5] All of Deppen's available time sheets for the period February 2008 – February 2010 are collected in exhibit J to Shepard's declaration.

shifts.  Shepard dec'l, ex. 1, ¶ 40; Cook dec'l, ex. 3.[6]

DMC did not require CRNAs at Harper/Hutzel to punch in and out on Kronos.  DMC, in deference to CRNAs' status as highly paid professionals, continued to allow CRNAs to fill out time sheets on the honor system.  However, in February 2010 DMC discovered that 8 CRNAs (including Deppen) had been misrepresenting their time.  Accordingly, in April, 2010, DMC began requiring all CRNAs to electronically punch in and out like other hourly employees. Shepard dec'l, ex. 1, ¶ 41.

DMC payroll has generated a "time detail report" for Deppen.  The report shows Deppen's paid hours, by day, for July 2008 – February 2010.  Because Deppen was not required to punch in and out, the time detail report reflects information Shepard reported to Kronos, relying upon Deppen's time sheets.  Shepard dec'l, ex. 1, ¶¶ 42-43 and ex. I; Cook dec'l, ex. 3, ¶¶ 4-7.

For example, Deppen's time sheet for a midnight shift beginning at 11pm on July 29, 2008, shows Deppen's "time in" as "11p" and "time out" as "7a," and "total hours worked" as "8°."  Shepard dec'l, ex. 1, ex. J at DMC00368.  When Shepard reported Deppen's time to Kronos for payroll purposes, Shepard believed that Deppen, like other Harper/Hutzel CRNAs, understood the standard shift times and meal break policy.  Based on that understanding, and in reliance upon Deppen's written representation that she worked a full 8 hours, Shepard interpreted Deppen's "time out" of "7a" as shorthand for 7:30am.

Shepard therefore reported to payroll, for input into Kronos, that on July 29, 2008 Deppen arrived at 11:00pm and left at 7:30am.  That resulted in total time of 8.5 hours.  By reporting in that fashion, and after deduction of 30 minutes for her meal break, Deppen would receive payment for the full 8 hours of time she claimed on her time sheet.  Shepard dec'l, ex. 1,

---

[6] **Jonathan Cook** is DMC's director of payroll.

¶ 46.

Accordingly, the Kronos payroll report shows for July 29, 2008 the following information that Shepard reported:  "in punch" at 11:00pm, "out punch" at 7:30am, and "totaled amount" (i.e., total hours) as 8.0.  Kronos reported exactly what Shepard inputted, and Deppen was paid for the full 8 hours of time she reported on her time sheet.  Had Shepard reported Deppen's "out punch" at 7:00am, Deppen would only have been paid for 7.5 hours; i.e., 8 hours less the 30-minute uncompensated meal break.  Shepard dec'l, ex. 1, ¶ 47 and ex. I.

The remainder of the Kronos "time detail report" for Deppen reflects Shepard's inputting of time for Deppen in the same fashion.  In each case Shepard reported Deppen's "out time" to the half hour, so that she would receive full payment for the "total hours" that she reported on her time sheet.  _Id_, ¶ 48.  Shepard, who attended Deppen's deposition, was surprised and disappointed to hear Deppen testify that she did not know the standard shift times run to the half hour, and that she had no knowledge of DMC's meal break policy.  _Id_, ¶ 49.

**H.  CRNAs received full pay for early starts or late exits; Deppen never made such a claim.**

It is not unusual for a CRNA to be asked to start a shift early, or to stay late to finish a case.  In those cases, the CRNA will note the early start or late exit on their time sheets and will receive full pay – including overtime, if applicable.  DMC's policy has always been to ensure that all employees receive full pay for all hours worked.  Shepard dec'l, ex. 1, ¶¶ 50-52, Ruan dec'l, ex. 2, ¶¶ 12-13.

There are hundreds of documented examples of this over the past several years.  _See_, for example, CRNA Maureen Cebula's November 18, 20 and 24, 2009 time sheets showing early arrivals or late departures, for which Cebula claimed and received overtime pay.  Shepard dec'l, ex. 1, ¶ 52 and ex. H, p. 6.

- 10 -

Shepard never asked Deppen to arrive early or stay late. And at no time did Shepard have any reason to believe that Deppen was arriving early, staying late or not receiving a meal break. Shepard dec'l, ex. 1, ¶¶ 103-109, and ¶¶ 89-93. Deppen admits she never made a claim for an early start or late exit, nor did Deppen ever complain to Shepard about any of the matters alleged in Deppen's lawsuit. Deppen dep., ex. 12, pp. 44-45, 67-68, 78-80, 83-85, and Shepard ex. J, Deppen time sheets.

**I.**    **Deppen's history of problems.**

From almost the day Shepard arrived at DMC in November 2005, Deppen was a problem employee. The following examples were documented, many were not (Shepard dec'l, ex. 1, ¶ 61, ex. M):

- **November 2005:** Deppen was suspended for failing to either report for her shift or call in.

- **March 2006:** Shepard discussed with Deppen "her tardiness, correct documentation for her arrival times, and complaints from her co-workers about being late."

- **October 2007:** Complaint from attending anesthesiologist that Denise Deppen was **"starting her shift with prior exhaustion"** and was so exhausted it was difficult to wake her to attend to her duties. When an emergency occurred at 3:55am, **"Denise Deppen never showed up. She is still in bed."** Emphasis added.

- **May 2008:** Deppen refused for months to get her mandatory TB test, resulting in suspension of her clinical privileges.

- **June 2008:** Complaint from co-worker (and fellow CRNA) Karen Crawforth: **"Denise Deppen is chronically late for the midnight shift."** Emphasis added.

- **June 2009:** Deppen was one of two CRNAs (out of roughly 50) who failed to timely comply with DMC-required annual netlearning education certification.

- **October 2009:** Annual evaluation noted area of improvement needed: "timely compliance with DMC annual job requirements, and start of shift times."

- **February 2010:** Deppen resigned after an investigation revealed that she was regularly leaving early but claiming pay for a full shift.

Shepard, in addition, has had numerous discussions with CRNAs, physicians and RNs concerning Deppen's problems including exhaustion on the job and sleeping through pages. Shepard dec'l, ex. 1, ¶ 62.  On the other hand, Deppen was never hesitant to complain if Deppen had any concerns about her paycheck or benefits.  But at no time since Shepard's arrival in 2005 did Deppen complain about missing a meal break or about any of the matters alleged in this lawsuit.  _Id_, ¶ 63; and _see_ Deppen dep., ex. 12, pp. 44-45, 67-68.

**J.  The master spreadsheet of Deppen's activities shows that Deppen routinely arrived late for her shifts, or left early, but nevertheless claimed full pay.**

**1.  Tracking Deppen's clinical time.**

In March 2009, Harper/Hutzel Hospital implemented an electronic medical records program called "Surginet."  Among many other important applications, Surginet allows Shepard to easily obtain, from Surginet's electronic database, time spent by CRNAs on clinical procedures.

When a CRNA inserts an epidural, or provides anesthesia during a C-Section or other procedure, the clinical procedure and anesthesia time are inputted into the Surginet system. Shepard dec'l, ex. 1, ¶¶ 54-59 and ex. K (printout of Deppen's surgical procedures and times). These procedures and times are relevant to this lawsuit because they confirm that Deppen had more than ample time to take 30-minute meal breaks during her shifts – and routinely much more than 30 minutes.

**2.  Tracking Deppen's times arriving and departing from DMC parking structures.**

DMC employees are required to wear a photo identification badge with an electronic strip unique to the badge owner.  DMC employee parking is gated with badge swipe stations.  To enter or exit the parking facility, an employee normally must use their badge to "swipe in" or

"swipe out." The times are electronically recorded in an electronic database in the ordinary course of business. Nelson dec'l, ex. 4.[7]

Deppen's badge swipe activity from March 1, 2008 through February 2010 has been collected in a report. Shepard dec'l, ex. 1, ¶ 67 and ex. N. The report shows, for example, that on March 9, 2008, Deppen "swiped into" the parking facility at 7:04:24am. Deppen "swiped out" of that parking facility on March 9, 2008, at 2:08:46pm. The report shows that on virtually every shift Deppen either arrived late and/or left early. For example, on March 9, 2008, Deppen swiped out of the parking structure at 2:08pm, whereas her shift ran to 3:30pm.

> **3.**   **Master spreadsheet showing Deppen's activities.**

DMC has prepared a "master spreadsheet" showing Deppen's activities by pay period, for March 9, 2008 through February 2010 when she resigned. Shepard dec'l, ex. 1, ex. O. The master spreadsheet is a compilation of information from (i) payroll reports showing the hours for which Deppen was paid, based on information reported by Shepard as explained earlier; (ii) the badge swipe report showing the times Deppen entered and exited the parking structure; and (iii) the clinical times worked by Deppen on her shifts, which first became easily accessible from Surginet in March 2009. Shepard dec'l, ex. 1, ¶ 70 and exs. I, J, K, N and O; and *see* Cook dec'l, ex. B; Nelson dec'l, ex. D.

The master spreadsheet is organized by two-week pay periods. For example, data for August 10-22, 2009 is compiled below:

---

[7] **Shaun Nelson** is DMC's corporate director of parking and external transportation.

**August 10th to August 22nd 2009**
(_see_ spreadsheet, Shepard dec'l, ex. O for explanatory notes)

| Date | Paid Hours (Note 1) | Park In (Note 2) | Park Out (Note 2) | Time paid but not worked | Total Clinical Time (epidurals at 1 hour) |
|---|---|---|---|---|---|
| 08/18/2009 08/19/2009 | 3:00pm – 7:30am (16 hours) | 2:56pm  4:39pm | 3:30pm  7:00am | 115 minutes | 2 hours  57 mins |
| 08/21/2009 08/22/2009 | 3:00pm – 3:30pm (24 hours) | 2:48pm | 3:17pm | 18 minutes | 3 hours   0 mins |

The "Paid Hours" reflect the time Shepard inputted into the Kronos payroll system, in reliance on Deppen's time sheets.  For August 18-19, 2009, Deppen's time sheets reflect time in of "3p" and time out of "7a," and claims 16 hours of pay.  For the reasons explained above, Shepard inputted into Kronos a shift of 3:00pm – 7:30am.  Therefore, after deducting a one-half hour uncompensated meal break, Deppen was paid for the full 16 hours she claimed.  Deppen similarly was paid for the full 24 hours she claimed for August 21-22.  Shepard dec'l, ex. 1, ¶ 74.

On August 18, 2009, Deppen "swiped into" the parking structure at 2:56pm.  It takes at a minimum 5 minutes, and often closer to 10 minutes, between swiping in to the parking structure, finding a parking spot, parking the car, and walking to the work station.  Shepard dec'l, ex. 1, ¶ 75; Ruan dec'l, ex. 2, ¶ 6; Deppen dep., ex. 12, p. 47.  And that assumes the employee walks directly to the work station and immediately begins working.  To give Deppen every possible benefit of the doubt, DMC used the minimum time of 5 minutes in preparing the spreadsheet. Therefore, if Deppen "swiped in" at least 5 minutes before the start of her shift, DMC deemed that to be an "on time" start.  On August 18, because Deppen "swiped in" at 2:56pm, DMC considered her to be one minute late which is included in the chart "time paid but not worked." Shepard dec'l, ex. 1, ¶ 75.

Likewise, if Deppen "swiped out" of the parking structure at least five minutes after the

- 14 -

end of her shift, DMC considered that she worked to the end of her shift.  On August 19, Deppen "swiped out" at 7:00am.  Again, giving Deppen every possible benefit of the doubt, Deppen must have left her work station no later than 6:55am.  Because Deppen's shift ran to 7:30am, and Deppen was paid to work to 7:30am, DMC computed 35 minutes as time paid but not worked.

Deppen was off-site during her August 18-19, 2009 shift, without authorization.  On August 18, Deppen swiped out of the structure at 3:30pm and swiped back in at 4:39pm, i.e., 69 minutes.  Adding 10 minutes for in and out parking and walking time (5 minutes leaving and 5 minutes returning), the total time spent out of the worksite was, at a minimum, 79 minutes.  Shepard dec'l, ex. 1, ¶ 77.  Thus, for Deppen's shift of August 18-19, 2009, Deppen's total time paid but not worked was:  (i) Late arrival:  1 minute; (ii) Off-site without authorization:  79 minutes; and (iii) Early departure:  35 minutes; for a total of 115 minutes.  For this two-week pay period, Deppen was paid for a total of 40 hours.  Of that, 133 minutes, or 2 hours and 13 minutes, was time paid but not worked.  _Id_, ¶¶ 78-80.

Deppen routinely arrived late, left early, or left "mid-shift" without authorization.  For virtually every pay period in the spreadsheet, Deppen was paid for a substantial amount of time not worked.  _See_, for example, June 1-14, 2008, **260 minutes**; June 15-28, 2008, **179 minutes**; September 7-20, 2008 **154 minutes**; October 5-18, 2008, **157 minutes**; January 25-February 8, 2009, **157 minutes**; March 22-April 4, 2009, **218 minutes**; April 5-18, 2009, **144 minutes**; May 3-16, 2009, **192 minutes**; May 17-30, 2009, **218 minutes**; May 31-June 13, 2009, **221 minutes**; June 14-27, 2009, **189 minutes**; July 26-August 9, 2009, **214 minutes**, September 6-19, 2009, **219 minutes**; September 20-October 3, 2009, **200 minutes**; October 18-31, 2009, **462 minutes**; December 13-26, 2009, **237 minutes**.  Shepard dec'l, ex. 1, ex. O (master spreadsheet) pages 7, 8, 14, 16, 24, 28, 29, 31, 33, 35, 37, 43, 47, 49, 53, 61.

- 15 -

**K.**   **Deppen received her 30-minute meal breaks, and routinely much more.**

DMC policy provides employees with a 30-minute unpaid meal break for any shift longer than 5 hours.  Only one thirty-minute meal break is deducted regardless of whether the shift is 8 hours, 16 hours or 24 hours, and regardless of how much break time the employee actually receives.  Shepard dec'l, ex. 1, ¶ 82.  Specifically, DMC's meal break policy provides as follows:

"1.   Meal Periods – Covered employees will be allowed a 30-minute unpaid meal time if the shift is at least five hours long.

"A.   The meal period must be scheduled and/or approved by supervision. Supervision will try to set meal times at the middle of the shift.

"B.   **Meal periods are not considered as time worked and will not be compensated.  If a scheduled meal period is missed, compensation for time worked or equivalent time off within that shift must be provided.**" _Id_, ex. F, emphasis added.

Pursuant to section 1(B) of the meal policy, if a CRNA were to miss a scheduled meal, "compensation for time worked or equivalent time off within that shift must be provided."  In accordance with that policy, had Deppen or any other CRNA informed Shepard that she or he had missed a meal break, and was unable to take the break later in the shift, DMC would have added 30 minutes of compensable time to their hours worked.  This was never an issue during the Relevant Period because, to Shepard's knowledge, neither Deppen nor any other CRNA working in Hutzel OB/Gyn was unable to take their meal break during a shift.  _Id_, ¶ 84.

Deppen's ability to take at least a 30-minute meal break is confirmed by examining Deppen's clinical times.  There are two general types of OB/Gyn clinical procedures requiring anesthesia (Shepard dec'l, ex. 1, ¶¶ 86-87):  One is "**epidural**."  That procedure involves placement of a catheter into the epidural space for a patient in labor, to alleviate pain.  For most epidurals, the time spent in placing the epidural is forty-five minutes or less.  After placement, registered nurses monitor the epidural and an anesthesia professional is called if there is a

- 16 -

problem.  To give Deppen every benefit of the doubt, DMC used 60 minutes for epidurals in the spreadsheet.

**Second**, CRNAs provide anesthesia during **surgical procedurals such as C-Sections**. C-Sections generally take 1-1½ hours, sometimes more, sometimes less.

Deppen's clinical times for August 18-19, and August 21-22, 2009 shifts, are shown below (Shepard dec'l, ex. O, p. 45) (epidurals shown as 1 hour although they routinely take far less time):

| Date | Shift | Paid Hours | Procedures | Time* (in minutes) | Total |
|------|-------|-----------|------------|--------------------|-------|
| 08/18/2009 - 08/19/2009 | 3:00pm – 7:30am | **16 hours** | C-Section Epidural Epidural | 57 60 60 | **2 hrs   57 mins** |
| 08/21/2009 - 08/22/2009 | 3:00pm – 3:30pm | **24 hours** | Epidural Epidural Epidural | 60 60 60 | **3 hrs   0 mins** |

The primary activity of anesthesia providers in the OB area involves placement of epidurals and anesthetics for surgical procedures such as C-Sections.  In addition to the clinical procedures themselves, anesthesia providers (CRNAs, anesthesia residents and attending anesthesiologists) in the Hutzel OB area have the following supporting duties (*id*, ¶ 88; Ruan dec'l, ex. 2, ¶ 18):

**Epidural follow-up:**  After an anesthesia provider places an epidural, the registered nurse monitoring the patient may have no need to call an anesthesia provider because there may be no problem.  In some cases, an anesthesia provider may need to follow-up for epidural management, including bolusing for pain management, assessment of function, or hemodynamic management.  Between epidurals not requiring follow-up, and those requiring follow-up, a rough estimate of the total average follow-up time is ½ to 1 hour.

**Beginning IVs:**  New patients may need to have intravenous (IV) lines inserted.  This

- 17 -

task normally is done by a registered nurse, but on rare occasions an anesthesia provider may be called for a difficult IV start.  This task might take, on average, perhaps 10-15 minutes.  On many shifts there is no need for an anesthesia provider to start an IV, on those shifts where this is required there may be a need to start 1 or 2 IVs.

**Pre-op interviews:**  Anesthesia providers will meet with a patient for whom surgery is scheduled, or may be scheduled, to interview the patient and prepare to administer anesthesia. This type of meeting normally will take perhaps 15 minutes.

**Post-op rounds:**  Anesthesia providers conduct patient rounds once a day, typically on the day shift.  CRNAs often divide this task with anesthesia resident(s).  Anesthesia residents, unlike CRNAs, have the authority to order medication.  A CRNA will stop and see patients who have, or have had, epidurals, whereas anesthesia resident(s) will see the patients who have had surgical procedures.  The time spent by a CRNA in rounds depends on the patient census and other factors, but can be estimated at perhaps 30 – 45 minutes on average.  Also, one of the day shift CRNAs may conduct patient rounds while the other attends to patients or other activities. (OB/Gyn medical physicians and OB/Gyn medical residents also conduct patient rounds to check on medical issues within their practice areas).

**OR preparation:**  On day shifts, CRNAs will assist in preparing the OB operating rooms with anesthesia medications.  This might take 30 minutes or so.

Deppen's time estimates for these "additional duties" are similar to those above.  Deppen dep., ex. 12, pp. 163-169 (an IV start could take five minutes, pre-op could be 15 minutes, longer if complex).  Deppen further testified that an uncomplicated epidural could be started in 20 minutes.  _Id_, p. 140.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

On August 18-19, 2009, Deppen worked a 16-hour shift (afternoon and midnight). During that 16-hour shift, Deppen started 2 epidurals and provided anesthesia for 1 C-Section (57 minutes).  Allowing 1 hour for each of the two epidurals (whereas Deppen testified that an uncomplicated epidural might take 20 minutes) and adding the C-Section time, results in total clinical time of roughly 3 hours.  Time estimates for "other duties," including pre-op for the C-Section (perhaps 15-30 minutes); starting, at most, 1-2 IVs (15-30 minutes each); and follow-up on the two epidurals (perhaps 45 minutes each), totals, at most, perhaps an additional 3 hours. The total clinical time, between the procedures themselves and the "supporting duties," would be, at most, in the range of 5-6 hours spread out over a 16-hour shift.  Deppen would have had more than ample time to take not only a 30-minute uninterrupted meal break, but certainly much more.  Shepard dec'l, ex. 1, ¶ 89.

Similarly, on August 21-22, 2009, during a 24-hour shift, Deppen began 3 epidurals. Even allowing generous times for "other duties," the additional time could not reasonably total more than 3-4 hours.  Deppen would have had more than ample time to take not only a 30-minute uninterrupted meal break, but certainly much more.  *Id*, ¶ 90.

CRNAs in OB work cooperatively with the other anesthesia providers (anesthesia residents and attending anesthesiologists) to ensure that all providers receive proper meal breaks. All shifts have, at a minimum, at least three anesthesia providers, between CRNA(s), resident(s) and an attending anesthesiologist, and the day and afternoon shifts have additional support.  The anesthesia providers will let one another know when she or he is taking a meal break, so that if a patient issue arises the other anesthesia professional(s) can cover it.  Ruan dec'l, ex. 2, ¶ 19; Shepard dec'l, ex. 1, ¶ 92.

There are no shifts in the master spreadsheet where Deppen would not have been able to

take a 30-minute uninterrupted meal break.  In the vast majority of shifts, Deppen would have been able to take breaks totaling much more than 30 minutes.  _Id_, ¶ 91.

At no time since Shepard joined Harper/Hutzel as director of anesthesia services, through Deppen's resignation in February 2010, did any CRNA working in OB/Gyn (including Deppen) complain that he or she did not receive at least a 30-minute uninterrupted meal break during a shift.  Shepard's understanding is that the CRNAs working in OB/Gyn received not only a 30-minute uninterrupted meal break, but often much more.  Shepard dec'l, ex. 1, ¶¶ 93, 106-115; and _see_ Deppen dep., ex. 12, pp. 44-45, 67-68, (after Shepard's arrival in 2005, Deppen never complained about missing a meal break or about any of the matters raised in this lawsuit).

   **L.  Overwhelming independent evidence confirms that (i) Deppen routinely took breaks of 30 minutes or more, and (ii) Shepard had every reason to believe <u>Deppen was receiving her meal breaks, and more.</u>**

Even allowing extremely generous time estimates for Deppen's "additional duties" (duties in addition to the clinical procedures themselves, namely, starting epidurals and attending surgical procedures), Deppen always had ample time for her meal breaks.  Shepard dec'l, ex. 1, ex. O (master spreadsheet pages 29 to 69).  For many shifts the time differentials are enormous – giving Deppen far more than 30 minutes to eat, rest or sleep.

**Deppen** has conceded this fact, **by serving the following request for admission**:

> "**Admit that Hutzel OB CRNAs often had periods of inactivity during their shifts when there were no patients that needed to be attended to.**"  Ex. 11, p. 13, request to admit number 11, emphasis added.

DMC made an unqualified admission (_id_, p. 14), hence, the matter has been "conclusively established."  Fed.R.Civ.P. 36(B).[8]

---

[8] DMC surmises that plaintiff served this request in the belief that DMC's admission might support plaintiff's defense to DMC's counterclaim.  DMC does not concur with any such belief on plaintiff's part.  Deppen had no right to arrive late or leave early, and claim pay for a full shift, regardless of the patient load.

Moreover, four medical professionals independently corroborate that OB/Gyn CRNAs, including Deppen, were regularly able to take at least a 30-minute uninterrupted meal break.  **Qingyun Ruan**, who regularly worked as a CRNA in Hutzel OB/Gyn since she joined DMC in 2006, states:

> "19.   While working in OB, I work cooperatively with the other anesthesia professionals to ensure that we receive proper meal breaks.  We will let one another know when we are taking a meal break so that if a patient issue arises the other anesthesia professional can cover it.  I do not recall an OB shift in which I did not get an uninterrupted 30-minute meal break.

> "20.   That I do not recall missing a meal break is consistent with the clinical times shown in the chart above.  Even after making a generous estimate of time for duties other than the clinical procedures noted, there is sufficient time for a 30-minute, uninterrupted break.

> "21.   For example, for the first entry, April 6, 2009, I worked a 16-hour shift, from 7:00am to 11:30pm.  I had three surgical procedures – a D&C and two C-sections, which in total took 3 hours 5 minutes.  Even assuming the supporting duties consumed several hours, there would be more than ample time for a 30-minute uninterrupted meal break.

> "22.   In looking over the other shifts and clinical times, it is likewise apparent that I was able to take a 30-minute uninterrupted meal break."  Ruan dec'l, ex. 2, ¶¶ 19-22.

**Carmen Schlitt** has worked as a registered nurse for roughly 25 years.  Schlitt regularly worked as "charge nurse" on midnight shifts with Deppen, in Hutzel OB/Gyn, for more than five years prior to Deppen's departure from the DMC.  Schlitt's declaration states:

> "5.   As charge nurse, I have overall responsibility for the [OB/Gyn] floor.  I am able to observe the activities of the CRNAs.

> "6.   Ms. Deppen regularly had substantial "down time" during her shifts, during which she had no patient responsibilities.  Ms. Deppen was regularly able, during her shifts, to take at least a 30-minute uninterrupted break and often much more.  Ms. Deppen would take her break in a room away from the surgical areas, where Ms. Deppen could eat, attend to other personal matters, or lie down and rest or sleep in a bed provided for that purpose.

"7.     I understand that Ms. Deppen, in addition to working at DMC, also worked as a CRNA at another (non-DMC) job.  Ms. Deppen would, on occasion, appear to be very tired.  On occasion, nurses working on the floor would have difficulty waking Ms. Deppen to attend to her responsibilities."  Ex. 5.

Vitaly Soskin, M.D., has actively practiced anesthesiology since 1969.  Dr. Soskin is not employed by the DMC, rather, he is employed by a private physician group that contracts with the DMC.  For roughly 13 years, until Deppen's resignation from the DMC in early 2010, Soskin regularly worked with Deppen providing anesthesia services for Hutzel OB/Gyn patients. Soskin dec'l, ex. 6, ¶¶ 1-3.  Soskin states:

"9.     Based on my years of interactions with Ms. Deppen, it has been my observation that she, as well as the other CRNAs, was regularly able, during their shifts, to take at least a 30-minute uninterrupted break and often much more. * * *"  Soskin dec'l, ex. 6, ¶ 9.

Timothy Bialobrzeski, D.O., was an anesthesiology resident from 2007-2010 and currently is enrolled in a fellowship program.  He regularly took call in Hutzel OB/Gyn and interacted with Deppen and other CRNAs.  Dr. Bialobrzeski likewise confirms that during Deppen's shifts, "there was substantial down time, and Ms. Deppen was regularly able to take breaks that often lasted well in excess of 30 minutes."  Bialobrzeski dec'l, ex. 7, ¶ 9.

Finally, Shepard's personal observations confirmed Deppen's ability to routinely take more than 30 minutes of break time.  Shepard's office was on the ground level of Harper/Hutzel, adjacent to the Harper operating rooms, whereas the OB department was on the third floor.  As a result, Shepard normally was not able to observe the activities of the CRNAs working in Hutzel OB/Gyn.  Shepard dec'l, ex. 1, ¶¶ 101, 107.  Deppen likewise confirmed that there was no CRNA manager able to observe the activities of the OB/Gyn CRNAs.  Deppen dep., ex. 12, pp. 67, 178-179.

However, from the time Shepard arrived at the DMC in 2005, until after Deppen left in

- 22 -

2010, Shepard routinely went up to the Hutzel OB/Gyn Anesthesia Room every other week to collect payroll time sheets. Shepard estimates doing this more than 100 times over those years. Shepard dec'l, ex. 1, ¶ 110. Shepard's routine was to arrive at work on those days between 5:00am and 5:30am, and then go up to the OB/Gyn Anesthesia Room to collect the OB/Gyn CRNAs' time sheets. Within the OB/Gyn Anesthesia Room is a separate room with a bed, and a door that can be closed for privacy, where a CRNA can lie down and rest or sleep. *Id*, ¶ 111.

Deppen would often work the midnight shift and would therefore often be on duty when Shepard went to the OB/Gyn Anesthesia Room. Of the roughly 100+ times Shepard went up to collect time sheets, from 2005 until Deppen left the DMC, Shepard conservatively estimates that Deppen was the assigned CRNA during 20 or more of those visits. *Id*, ¶ 112.

On all but two visits, Shepard did not observe Deppen. Rather, Shepard observed that one of the private rooms within the OB/Gyn Anesthesia Room had the door closed and the light off. The only anesthesia provider who would be using that room was the responsible CRNA, namely, Deppen. Accordingly, Shepard concluded that Deppen was resting or sleeping. The two occasions on which Shepard did observe Deppen were as follows: On one occasion Shepard encountered Deppen emerging from the private room; Deppen had "bed hair" and had clearly been sleeping. On one occasion Deppen was entering the OB/Gyn Anesthesia Room from the hallway and Shepard did not know what she had been doing. *Id*, ¶ 113. Shepard's personal observations confirmed all other available information, namely, that Deppen had more than ample time during her shifts to take a 30-minute meal break – and routinely much more. *Id*, ¶¶ 113-114.

**M.   Deppen's deposition testimony.**

Deppen's initial disclosures state that Deppen is pursuing a claim for precisely 30

minutes of time for each and every shift.  Ex. 10, p. 4, § III.  Accordingly, while plaintiff's complaint (ex. 8) makes no mention of meal breaks, it now appears that Deppen has abandoned any claim other than a meal break claim.

Deppen testified she believed she was entitled to a meal break – but claimed to have no knowledge of DMC's meal break policy:

> "Q. [By Mr. Raimi]   During the period of 2006 through 2010, did DMC have a policy for meal breaks?
>
> "A.    I don't know.
>
> "Q.    Have you ever seen a DMC meal break policy?
>
> "A.    No.
>
> "Q.    Did you ever look for one?
>
> "A.    No.
>
> "Q.    Did you ever talk to any of your managers at any time about a meal break policy?
>
> "A.    No.
>
> "Q.    What was your understanding, if any, for the period of 2006 through 2010 of any meal break policy?
>
> "A.    I don't know what the meal break policy was there.
>
> "Q.    So you had no understanding of what the policy might be?
>
> "A.    No."  Deppen dep., ex. 12, pp. 63-64.

Deppen had no idea how long a meal break she might be entitled to, but understood it was to be compensated.  _Id_, pp. 64-65.  Deppen testified that if she worked from 7:00am to 3:00pm (which Deppen "understood" was the end of the day shift), she was entitled to 8 hours pay regardless of whether she did or did not receive a meal break.  Ex. 12, pp. 69-71.

Deppen was then asked to assume that she worked a shift from 7:00am to 3:10pm, i.e., 8 hours and 10 minutes.  Asked if she was making a claim in this lawsuit for the 10 minutes, Deppen testified, **"Yes, <u>if I didn't get a lunch break</u>."**  Ex. 12, pp. 72-75.  Deppen never complained to Shepard about allegedly not receiving a meal break, or about any of the matters at

- 24 -

issue in this lawsuit.  Ex. 12, pp. 44-45, 67-68, 78-80, 83-85.  Deppen further testified:

> "Q.  [By Mr. Raimi]  Did you consider lying down or sleeping the same as a meal break?
>
> "A.    Sometimes.
>
> "Q.    When would it not be?
>
> "A.    At night.
>
> "Q.    Why would it be different at night?
>
> "A.    Because I didn't eat, physically eat lunch."  Ex. 12, pp. 67-68.

Deppen admitted to sleeping at times on all three shifts – days, afternoons and midnights.

Deppen could not estimate how long she would sleep, "It would depend how busy it was."

Deppen claimed to be unable to make any estimate of how often she slept on the job.  Deppen

dep., ex. 12, pp. 66, 170.

Deppen admitted leaving early or arriving late on a number of days.  Deppen dep., ex. 12,

pp. 79, 105-107, 181-182.  The master spreadsheet shows a late arrival or early departure on

virtually every shift.  Shepard dec'l., ex. 1, ex. O.  And even if Deppen truly believed her shift

ran only to the hour, Deppen still arrived late, or left before the time Deppen claims her shift

ended, on many shifts.

Deppen alleged that she would receive the "approval" of the attending anesthesiologist to

leave early:  "They [the anesthesiologist] would frequently tell us, you know, it's not busy or

residents are up here you have coverage, why don't you go ahead and go."  Ex. 12, p. 135.

Deppen conceded that the attending anesthesiologists were employees of a private physician

group, and were not her employer.  Ex. 12, pp. 128-129.  The anesthesiologists had no

"authority" to let Deppen leave early. Shepard dec'l, ¶ 81; Soskin dec'l, ex. 6, ¶ 8.

Finally, Deppen admitted that to the extent she allegedly did not get a lunch break, and,

as a result, allegedly worked beyond her shift time, **Deppen used "self help,"** *i.e.*, **leaving early,**

**to remedy the issue**:

> "Q. (By Mr. Raimi)  How is the fact that you left early one day relevant to whether you would make a claim for allegedly working late a different day?
>
> "A.    I must've misunderstood –
>
> "MR. ASKER:  Legal conclusion.  Go ahead.
>
> "THE WITNESS:  I must have misunderstood your question.  Could you just rephrase what you are asking please?
>
> "Q. (By Mr. Raimi)   You just heard the testimony read back, correct?
>
> "A.    Yes.
>
> "Q.    You said -- I asked you why you didn't write down on your time sheets when you allegedly work extra time.  Do you recall that?
>
> "A.    Yes.
>
> "Q.    And you said, you would be -- there would be times you would be relieved early or left early, correct?
>
> "MR. ASKER:  Characterization.  Go ahead.
>
> "Q. (By Mr. Raimi)  Do you recall saying that?
>
> "A.    Yes.
>
> "Q.    How is that fact that you left early on one day relevant to not putting on your time sheets a claim for allegedly working over on a different day?
>
> "MR. ASKER:  Same objection.  Go ahead.
>
> "THE WITNESS:  **Because it evened out**.  Some days we came in early and started working early, some days we left late and worked late."  Ex. 12, pp. 79-80, emphasis added.

**N.    Deppen's conduct at DMC, namely, regularly arriving late and leaving early, and regularly sleeping for large blocks of time, enabled Deppen to carry on her DMC job and two demanding non-DMC jobs.**

**1.    Deppen was single parent to two minor children.**

Deppen, during the Relevant Period, was a single parent to two minor children.

Deppen's regular household responsibilities included grocery shopping, housekeeping, preparing

meals and transporting her children to and from sports activities.  Deppen dep., ex. 12, pp. 5-7.

- 26 -

Deppen lives in the northeast suburbs and her travel time to (or from) DMC is roughly 30 minutes each way.  Ex. 13.  When asked why she so often arrived late for work at DMC, prompting written and verbal complaints from co-workers, Deppen testified that her babysitter arrived late.  Deppen dep. ex. 12, pp. 102-105.

### 2.   Deppen worked several jobs at Oakland Regional Hospital.

Throughout the Relevant Period Deppen worked at Oakland Regional hospital (ORH).  ORH paid Deppen $240,633.90 in 2008 and $211,480.80 in 2009.  Ex. 14.

ORH, which has facilities in Oakland and Macomb counties, is not a full service hospital and, unlike DMC, does not require 7x24 CRNA staffing.  ORH does not operate separate shifts, rather, all surgeries are scheduled during the day.  Deppen dep., ex. 12, pp. 89, 111-113.

Deppen was an independent contractor for ORH, not an employee.  Meyer dep., ex. 15, pp. 47-49.[9]  Deppen performed two separate jobs for ORH.  **First**, she provided CRNA services.  Deppen was generally entitled to a minimum of 8 hours pay, at $90 per hour, for every day she worked – even if she worked fewer than 8 hours.  When Deppen worked more than 8 hours in a day she was paid overtime at $135 per hour (time-and-a-half).  Deppen dep., ex. 12, pp. 117-118; Meyer dep., ex. 15, pp. 30-31.  Deppen did not have an opportunity to rest or sleep when working at ORH.  Deppen dep., ex. 12, p. 115.

**Second**, ORH paid Deppen an additional $1,500 per month for managing CRNA staffing and running the surgery board.  Deppen dep., ex. 12, pp. 15-16.

### 3.   Deppen shuttles between DMC and ORH.[10]

Deppen shuttled from shifts at DMC to ORH, and vice-versa.  Deppen routinely left her

---

[9] **Gordon Meyer** is director of human resources for ORH and testified as its designated representative.

[10] Exhibits 16 and 17 collect Deppen's ORH time cards for 2008, 2009 and a portion of 2010.  Deppen was supposed to punch in and out at ORH but she often neglected to do so.  Meyer dep., ex. 15, p. 36.  Deppen's times leaving from, and arriving at, ORH, are shown on the master spreadsheet.  Shepard dep., ex. 1, ex. O.

DMC midnight shift well before 7:30am, and often before 7:00am, so she could go directly to work at ORH.  *See*, for example, master spreadsheet, p. 19, November 20-21, 2008 ("swiped out" from DMC parking lot at **7:02am**, punched in at ORH at **7:26am**), November 24-25, 2008 ("swiped out" from DMC parking lot at **6:58am**, punched in at ORH at **7:24am**).  There are similar examples throughout the spreadsheet.

On June 1, 2009, Deppen "swiped out" from the DMC parking lot at **7:16am**.  Deppen did not "punch in" at ORH that day, but wrote on her time card that she arrived at ORH at **7:15am**, a physical impossibility.  Deppen billed ORH for 0.85 hours of overtime that day at the rate of $135/hour.  Meyer dep., ex. 15, pp. 41-42.

Deppen likewise regularly left ORH mid-afternoon to go directly to a DMC shift beginning at 3:00pm.  Deppen would leave ORH before she had worked 8 hours.  But under her 8-hour minimum agreement Deppen would be paid by ORH for 8 hours – past her 3:00pm DMC start time.  Hence, Deppen would receive pay both from ORH and DMC during the early part of her DMC shift.  *See*, for example, Shepard dec'l, ex. 1, ex. O, p. 39, entry for July 7, 2009.

Deppen often arrived to work at DMC exhausted and, as a result, would fall so deeply asleep that she would sleep through pages.  Shepard dec'l, ex. 1, ¶¶ 61-62; Schlitt dec'l, ex. 5, ¶ 7.  This is scarcely surprising.  From February 21-25, 2009, for example, Deppen worked 16.96 actual hours at ORH, and was paid for 48 hours (two 24-hour shifts) at DMC.  64.96 hours over 4 days is an average of **16.24 hours per day**.  Also not surprising is that Deppen left more than an hour early from each of her DMC shifts during that period.  Ex. 18.  A similar calculation for August 23-28, 2009 produces 72.57 hours, or an average of **14.51** hours over the five days.  Ex. 18.  Those numbers do not include driving time which would add another 1-2 hours per day.  Ex. 13.  Nor do they include Deppen's household and parental responsibilities.

Deppen, in a remarkable understatement, testified as follows:

"Q. [By Mr. Raimi]  Did it assist you, the ability to sleep at DMC, help you carry as many hours as you were carrying and a full responsibility at home?

"MR. ASKER:      Foundation, compound.

"THE WITNESS:  That made it easier.

"MR. ASKER:      Hang on.  Go ahead.

"THE WITNESS:  I'm sure it made it easier."  Deppen dep., ex. 12, pp. 171-172.

## PROCEDURAL BACKGROUND

In February 2010, anesthesia residents complained about certain Hutzel OB/Gyn CRNAs, including Deppen, leaving their shifts early.  Shepard conducted an investigation of all 50 (roughly) Harper and Hutzel CRNAs.  Shepard dec'l, ex. 1, ¶¶ 94-96; Bialobrzeski dec'l, ex. 7, ¶ 8.

Out of the roughly 50 CRNAs working at Harper/Hutzel, Shepard found eight CRNAs who were serious offenders.  Six of the eight CRNAs worked in Hutzel OB/Gyn.  All eight CRNAs, including Deppen, submitted resignations.

Plaintiff filed this lawsuit in June 2010.  Ex. 8, complaint.  Plaintiff makes vague claims about arriving early or staying late without proper compensation.  Ex. 8, ¶¶ 12-20.  The complaint makes no mention of, or allegations concerning, meal breaks.  DMC's answer and counterclaim are appended as ex. 9.

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD.

In *United States v. Barczyk*, 697 F.Supp.2d 789, 791 (E.D.Mich. 2010), this Court granted summary judgment and stated:

"* * * The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural short-cut. * * *.

- 29 -

"The standard for determining whether summary judgment is appropriate is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' * * *." *Id*, citations omitted.

To defeat a properly supported summary judgment motion "there must be evidence on which a jury could reasonably find for the nonmovant." *Id*, citations omitted.

## II.   DEPPEN'S FLSA CLAIM SHOULD BE DISMISSED.

### A.   Controlling law.

**1.   An FLSA plaintiff has the burden of proving (i) that she performed overtime work for which she was not properly compensated, and (ii) that the employer knew or should have known of the overtime work.**

In *Wood v. Mid-America Management Corp.*, 192 Fed. Appx. 378, 2006 WL 2188706 (6th Cir.), ex. 27, plaintiff Wood was employed as an on-site maintenance technician at a large apartment complex owned by defendant.  Wood was responsible for completing and signing his own time cards.

Wood sued for unpaid overtime under the FLSA.  Wood claimed he worked, but did not report, overtime for a variety of tasks including patrolling the grounds, cleaning the pool and surrounding areas, attending to vacated rental units to prepare them for new tenants and working in the boiler room.  When Wood claimed overtime on his time cards, he was paid for it.

The Sixth Circuit affirmed the trial court's grant of defendant's summary judgment motion.  The Court first observed that "**An FLSA plaintiff must prove by a preponderance of the evidence that he or she 'performed work for which he or she was not properly compensated.'**" *Id*, ex. 27, at *2, citations omitted, emphasis added.

The Court then held that plaintiff's FLSA claim failed for the following reason:

"* * * '[A]n employee,' it is true, 'must be compensated for time she works outside of her scheduled shift, even if the employer did not ask that the employee work during that time,' **but this requirement applies only if 'the**

- 30 -

employer 'knows or has reason to believe that the employee is continuing to work' and that work was 'suffered or permitted' by the employer.' * * * Quite sensibly, 'an employer cannot suffer or permit an employee to perform services about which the employer knows nothing.'" *Id*, ex. 27, at *3, emphasis added, citations omitted.

The Court restated its holding as follows:

"At the end of the day, an employee must show that the employer knew or should have known that he was working overtime or, better yet, he should report the overtime hours himself.  * * *." *Id*, emphasis added.

*Wood* has been applied in several recent decisions dismissing FLSA claims.  In *Wharton v. Gorman-Rupp Company*, 2008 WL 1696942 (N.D.Ohio), ex. 26, plaintiff was employed by defendant in a variety of administrative support positions.  Plaintiff sued defendant under several theories including employment discrimination, FMLA and FLSA.

Plaintiff's FLSA claim alleged that plaintiff had worked some 200 hours of unpaid overtime over the period August 2005 to May 2007.  The district court (citing *Wood*) observed that "In order to succeed on her FLSA claim, Plaintiff Wharton needs to show that the overtime work she allegedly performed was done with her employer's knowledge."  *Id* at *8.  Plaintiff's FLSA claim failed because "[Plaintiff] presents no evidence that Defendant was aware that she was working overtime hours."  *Id*.  Plaintiff's claim failed for yet another reason:

"* * * The Defendant correctly notes that the FLSA only applies to overtime work performed in excess of 40 hours per week, not 8 hours per day. * * * As the Defendant has pointed out, for nearly all of the specified weeks in which the Plaintiff claims she worked overtime, the Plaintiff's use of vacation and/or sick time exceeded her alleged overtime, thus resulting in the Plaintiff's total number of hours worked per week falling below the 40-hour threshold."  *Id*, at *9.

*See also* *Pipkins v. Service Corporation International*, 2008 WL 1869737 (E.D.Tenn.), ex. 25, at *11 (plaintiff's FLSA claim dismissed where plaintiff could not "show that the employer knew or should have known that [she] was working overtime").

- 31 -

Finally, the FLSA does not provide a remedy unless plaintiff's claim implicates **overtime** – _i.e._, work in excess of 40 hours in a week.  To the extent Deppen is claiming, for example, that she worked 37 hours in a week but was paid for 36 hours, the FLSA provides no remedy.  _See_ 29 U.S.C.A. 207 (remedy for work in excess of 40 hours in a week), and _Davis v. Food Lion_, 792 F.2d 1274, 1276 (4th Cir. 1986), ("to recover [under the FLSA], an employee must prove that he worked overtime hours * * *").

For many weeks during the Relevant Period, Deppen was not scheduled to work 40 hours.  She would have no conceivable FLSA claim for those weeks.  While preserving this argument, the record in this case shows that Deppen was regularly paid for **more** hours than she worked, no matter what her schedule.

### 2. Provided an FLSA plaintiff does not spend her break time "predominantly for the employer's benefit," meal breaks are not compensable.

In _Hill v. United States_, 751 F.2d 810 (6th Cir. 1985), ex. 22, a letter carrier's shift was 8½ hours, but he was paid for 8 hours after an automatic 30-minute meal break deduction.  Plaintiff sued under the FLSA seeking overtime compensation for the 30-minute meal break deductions.  Plaintiff alleged that during his meal break he was required to carry with him, and was responsible for, a variety of items integral to his job including lists of mail, receipts and monies collected prior to lunch.  Plaintiff also alleged that during his lunch he was in uniform "serv[ing] the public as requested including providing information and accepting mail."

The district court dismissed plaintiff's lawsuit on summary judgment and the Sixth Circuit affirmed.  The Sixth Circuit rejected the Department of Labor's regulation, 29 C.F.R. § 785.2, which suggests that a meal break is compensable unless the employee is "completely relieved from duty for the purpose of eating regular meals."  _Id_, p. 813.  Rather, the Sixth Circuit

adopted the following common sense standard which continues to govern today:

> "* * * As long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA." *Id*, p. 814.

The Sixth Circuit explained its rationale for adopting that standard:

> "We approve the district court's conclusion that appellant's meal period is not compensable because he was not required to perform any activities that could be characterized as substantial duties. Our holding is based on the need for a flexible and realistic standard for compensability and on the particular circumstances of this case." *Id*, p. 814.

In *Myracle v. General Electric Company*, 33 F.3d 55, 1994 WL 456769 (6th Cir.), ex. 24, plaintiffs were maintenance mechanics at a GE facility that manufactured light bulbs for automobiles. Plaintiffs alleged that they were entitled, under the FLSA, to compensation for 20-minute meal breaks.

Plaintiffs were "skilled maintenance mechanics responsible for overseeing the operations of complex machinery" that operated continuously, including during plaintiffs' breaks. *Id*, *1, 2. Plaintiffs were free to choose the time of their meal break. *Id*, at *2.

Plaintiffs argued that they were not relieved of their duties during meal breaks because "their meal breaks are sometimes interrupted by power outages, machine breakdowns, or supervisor inquiries." *Id*, p. *2. "A plant supervisor confirmed that mechanics are sometimes paged during their meal breaks." *Id*. Plaintiffs testified that some of them had been disciplined for production deficiencies which occurred during their unpaid meal break, and the other plaintiffs testified they were aware of such disciplines. *Id*.

The Sixth Circuit, quoting *Hill*, affirmed the district court's judgment in favor of General Electric. *Id*, at *4. The Court held that for plaintiffs to prevail, they were required to prove as follows: "* * * **it is the employee who bears the burden of proving that he or she performs**

substantial duties and spends his or her meal time **predominantly for the employer's benefit.**"  _Id_, emphasis added, citations omitted.  "* * * Therefore, in order to prevail, the plaintiffs in this case must establish that they are not 'substantially relieved' of their duties and that they spend their meal period 'predominantly' for their employer's benefit."  _Id_.

### 3.   An FLSA plaintiff is not entitled to a windfall recovery at the employer's expense.

Fundamental to the FLSA is the following rule of law:  "plaintiffs are entitled to be made whole, **not to a windfall at the [defendant's] expense.**"  _Lupien v. City of Marlborough_, 387 F.3d 83, 88 (1st Cir. 2004); _Roman v. Maietta Construction, Inc._, 147 F.3d 71, 76 (1st Cir. 1998); _Martin v. Indiana Michigan Power Company_, 292 F.Supp.2d 947, 960 (W.D.Mich. 2002).

### B.   Deppen's FLSA claim should be dismissed.

### 1.   Deppen cannot present evidence that she worked overtime but was not compensated.

"A FLSA plaintiff must prove by a preponderance of the evidence that he or she 'performed work for which he or she was not properly compensated.'"  _Wood, supra_, ex. 27, at *2.  Deppen cannot present evidence, for any pay period, that she was not properly compensated for overtime or, indeed, for any time worked.  The record overwhelmingly shows the contrary.  Facts, §§ J, K, L, M and N.

DMC provided to plaintiff's counsel, either prior to or with DMC's initial disclosures, all key documents relevant to plaintiff's claim, namely, DMC's meal break policies, Deppen's time sheets, time detail (payroll) report, badge swipe report and clinical time report.  Shepard dec'l, exs. F, I, J and K.  DMC also compiled the information in convenient spreadsheet form similar to exhibit O to Shepard's declaration.

If plaintiff had a viable claim, she and her counsel would have carefully reviewed those documents and (i) identified specific weeks in which Deppen allegedly worked over 40 hours but did not receive overtime compensation, and (ii) provided, at the very least, a plausible and supportable estimate of the alleged overtime by week.  Indeed, that was plaintiff's legal obligation under Fed.R.Civ.P. 26(a)(1)(A)(iii) (initial disclosures must provide a computation of damages claimed) and Rule 26(e) (duty to supplement).  <u>C.f.</u> *Lopez v. Construction Protective Services, Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), (FLSA plaintiffs' damages evidence stricken under Rule 37(a)(1) where opt-in FLSA plaintiffs failed to comply with initial disclosure requirements); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006), (affirming exclusion of lost profits theory of damages that was first disclosed in a proposed pre-trial order).

Deppen's initial disclosures, which have never been supplemented, state in relevant part as follows on damages:

> "Ms. Deppen's damages result from Defendant's failure to pay her one-half hour (30 minutes) for every 8-hour shift worked, which Defendant's records indicate she worked but was not compensated for.  Ms. Deppen has been working at least five (5) 8-hour shifts per week over the last three (3) years. * * *."  Ex. 10, p. 4.

The most cursory review of the documentary evidence shows that Deppen did not work "at least five (5) 8-hour shifts per week over the last three (3) years."  Moreover, Deppen's claim that she is entitled to an additional 30 minutes pay for each and every 8-hour shift is simply bizarre.  It ignores all of the documentary evidence showing that Deppen, on virtually every shift, was paid for more time than she worked.  It ignores Deppen's admissions, confirmed by DMC's spreadsheet, that Deppen often arrived late and left early (claiming, without support, that she was entitled to do so because it "**evened out**" the time she allegedly worked over).  It ignores Deppen's admission that she often had periods of inactivity on her shifts, and all the other

- 35 -

evidence showing that Deppen not only received her 30-minute meal breaks but routinely much more.  Facts, §§ J, K, L, M and N.

Examination of Deppen's times in and out, and Deppen's clinical times, for virtually any pay period, confirms that Deppen was always overpaid and never underpaid.  The two-week pay period of August 10-22, 2009 is examined earlier in this brief and, as shown, Deppen was substantially overpaid.  The prior pay period of July 26 – August 9, 2009 is examined below:

### July 26th to August 9th 2009
### (_see_ spreadsheet, Shepard dec'l, ex. O for explanatory notes)

| Date | Paid Hours (Note 1) | Park In (Note 2) | Park Out (Note 2) | Time paid but not worked | Total Clinical Time (epidurals at 1 hour) |
|---|---|---|---|---|---|
| 08/04/2009 | 3:00pm – 7:30am (16 Hours) | 2:39pm (left ORH@2:17pm) | 7:12am (ORH@7:34am) | 23 minutes | 3 hours  55 mins |
| 08/06/2009 | 3:00pm – 7:30am (16 Hours) | 3:10pm (left ORH@2:42pm) | 7:15am (ORH@7:38am) | 35 minutes | 4 hours  0 mins |
| 08/08/2009 | 7:00am – 3:30pm (8 Hours) | 6:55am | 2:27pm | 68 minutes | 3 hours  10 mins |
| 08/08/2009 08/09/2009 | 11:00pm - 11:30pm (24 Hours) | 10:56pm | 10:08pm | 88 minutes | 6 hours  15 mins |
| **Total time paid but not worked = 214 minutes** | | | | | |

Even allowing several hours per shift for "additional duties" (in addition to the clinical times shown), there is no shift where Deppen can plausibly argue she would not have had more than ample time for a meal break.  And it is too obvious for words that whether Deppen used her meal break to eat or sleep, the time was non-compensable because Deppen was not spending her break time "predominately for the employer's benefit."  Finally, on two shifts, August 8 and August 8-9, Deppen left more than 1 hour before the shift ended.  During this pay period Deppen was overpaid for 214 minutes, _i.e._, 3 hours and 34 minutes, roughly 5.5% of the total paid time.

**2.    Deppen was paid for every hour she reported on her time sheets, and DMC had no reason to believe that Deppen was not reporting all hours worked.**

Even if Deppen could present some plausible evidence that she worked overtime without pay, and she cannot, Deppen's claim still fails.  It is uncontested that DMC paid Deppen for every hour Deppen herself reported – under the "honor system" – on her time sheets.  The case law discussed above demonstrates that even where an FLSA plaintiff works unpaid overtime (which Deppen did **not**), the plaintiff must prove that the employer "knew or should have known" of the overtime work.

The record shows:  (i) Shepard was not in a position to observe Deppen's activities and, hence, would have no reason (absent Deppen's complaints) to know of any alleged overtime, (ii) Deppen never complained, and never reported any "additional time" on her time sheets, and (iii) Shepard had no reason on earth to suspect that Deppen was working overtime, because she was not.  Rather, **Shepard had every reason to believe that, if anything, Deppen was being overpaid**.  Facts, sections J-N.  Of course Deppen never complained – she was being **overcompensated** by thousands of dollars.

**3.    Any award for Deppen would represent a windfall recovery at DMC's expense.**

DMC does not take the position that Deppen's sleeping on the job was necessarily improper.  Nor does DMC contend that Deppen's working multiple jobs was necessarily improper.

**But the plain fact is this:  Deppen's conduct, in regularly arriving late and leaving early from her DMC shifts, and regularly sleeping for large blocks of time on her DMC shifts, enabled Deppen to earn roughly $375,000 in 2009 while also acting as single parent to two minor children.**  Having used DMC in that fashion, for Deppen now to come to Court

and assert a claim for **more** compensation, on a contrived theory that she did not receive meal breaks, or whatever, is shameful.

### III.   DEPPEN'S MICHIGAN STATUTORY CLAIM SHOULD BE DISMISSED.

Deppen alleges that DMC violated the Michigan Wage and Fringe Benefits Act, "MWFBA," specifically M.C.L. 408.472 and M.C.L. 408.477. Copies are appended as exhibit 19. The most cursory reading of those statutes show they are completely irrelevant to this lawsuit. *See Jackson v. Wal-Mart*, 2005 WL 3191394 (Mich.App.), ex. 23 at p. 9 (MCL 408.472 and MCL 408.477 not "even arguably applicable" to plaintiff's claim for compensation for working "off the clock" and for missed and/or shortened rest and meal breaks).

Moreover, this Court recently held that a plaintiff must pursue her administrative remedies prior to suing under the MWFBA. *Ayres v. Balousek*, 2005 WL 2033527 (E.D.Mich.), ex. 21. DMC contacted the Michigan Department of Labor and was advised they had no record of any complaint from Deppen.

Finally, any Michigan law claim would fail for the same reasons that Deppen's FLSA claim fails: Deppen was overpaid, not underpaid.

### IV.   DEPPEN'S CLAIM FOR "FAILURE TO MAINTAIN RECORDS" SHOULD BE DISMISSED.

Deppen alleges that DMC violated the FLSA's record-keeping requirements in 29 U.S.C. § 211(c). However, there is no private right of action to enforce 29 U.S.C. § 211(c). *Elwell v. University Hospitals*, 276 F.3d 832, 843 (6th Cir. 2002); *Frisby v. Weiner & Associates*, 669 F.Supp. 2d 863, 868 (N.D.Ohio, 2009).

Moreover, there is nothing improper in having an employee maintain their own time records. *Wood, supra*. Deppen was unable to identify any problem with DMC's "honor system" time recording practices – other than her paycheck allegedly was once delayed. Deppen dep., ex.

12, pp. 85-88.

**V.     DEPPEN'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.**

Courts have found that state common law claims, pled in the same fashion as Deppen's unjust enrichment claim, are preempted as a matter of law by the FLSA. *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 193 (4th Cir. 2007), ex. 20, (state common law claims preempted as a matter of law). Here, there can be no doubt that Deppen's unjust enrichment claim fails, because the **claim is premised exclusively on alleged violations of the FLSA and MWFBA:**

> "In failing or refusing to compensate Plaintiff **the amount to which she was entitled under the FLSA and the Michigan Wages and Fringe Benefits Act**, Defendant received a benefit from Plaintiff in that Defendant retained the use and control of monies to which they were not entitled and to which Plaintiff was entitled." Plaintiff's complaint, ex. 8, ¶ 49, emphasis added.

DMC has asked the Court to dismiss Deppen's FLSA and MWFBA claims. If the Court agrees, then Deppen's unjust enrichment claim – which is premised entirely on alleged violations of the FLSA and MWFBA – also should be dismissed. Moreover, it was Deppen, and certainly not the DMC, who was "unjustly enriched."

**CONCLUSION AND RELIEF**

DMC asks that plaintiff's lawsuit be dismissed. If that relief is granted, DMC will consent to dismissal of its counterclaim, but reserves the right to pursue costs and attorney fees if there are proper grounds for doing so.

DETROIT MEDICAL CENTER, LEGAL AFFAIRS

By:   /s/ Charles N. Raimi
Charles N. Raimi (P29746)
Deputy General Counsel
Attorney for Defendant/Counter-Plaintiff
4707 St. Antoine, Suite W514
Detroit, Michigan 48201
(313) 966-2226
Dated: February 1, 2011          craimi@dmc.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 1, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

> Paul P. Asker, Esq.
> Jessica Dopierala Hite, Esq.
> ASKER PERLMUTER PLC
> Attorneys for Plaintiff/Counter-Defendant, Denise S. Deppen
> 32000 Northwestern Highway
> Suite 275
> Farmington Hills, MI  48334
> pasker@attorneyclientsolutions.com
> jhite@attorneyclientsolutions.com

> */s/ Charles N. Raimi* (P29746)
> Attorney for Defendant/Counter-Plaintiff
> DMC Legal Affairs
> 4707 St. Antoine
> Suite W514
> Detroit, MI  48201
> Phone:  (313) 966-2226
> craimi@dmc.org

Dated:  February 1, 2011