UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE S. DEPPEN,

               Plaintiff,

                                       Case No. 10-12229

vs.

                                       HON. GEORGE CARAM STEEH

THE DETROIT MEDICAL CENTER,
a Michigan non-profit corporation,

               Defendant.

_____/

**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING
ACTION**

## I.    INTRODUCTION

On June 17, 2010, plaintiff, Denise S. Deppen, filed the instant action against

defendant, the Detroit Medical Center ("DMC"), for allegedly violating the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (count I),and the Michigan Wages and

Fringe Benefits Act ("WFBA"), MICH. COMP. LAWS § 408.471 et seq. (count II) by

automatically deducting one half an hour of pay per shift for meal breaks, even though

plaintiff alleges that she did not take any breaks during her shift.  Plaintiff also brings a

claim for unjust enrichment (count III).

## II.    FACTUAL BACKGROUND

On November 3, 1993, plaintiff was hired as a Certified Registered Nurse

Anesthetist ("CRNA") at DMC's Hutzel Women's Hospital ("Hutzel") providing CRNA

services in the obstetrics ("OB/Gyn") department.  A CRNA is an advance practice nurse,

specializing in anesthesia.

DMC's Harper University Hospital ("Harper") and Hutzel are located within the same large building complex.   Harper is a comprehensive, tertiary hospital.   Harper has more than twenty five operating rooms.   Hutzel specializes in OB/Gyn services.   CRNA services at Harper/Hutzel are needed seven days a week, twenty four hours a day.   Standard shift times at Harper/Hutzel for CRNAs are: Shift 1 (day shift): 7:00 a.m. through 3:30 p.m.; Shift 2 (afternoon shift):  3:00 p.m. through 11:30 p.m.; Shift 3 (midnight):  11:00 p.m. through 7:30 a.m.   CRNAs work under the medical supervision of an anesthesiologist who is a licensed physician.

Anesthesia services at Harper and Hutzel differ in certain respects.  At Harper, the vast majority of surgical procedures are scheduled in advance.  At Hutzel, most procedures cannot be scheduled in advance because it is impossible to know when a patient will go into labor.  Nor is it possible to know if a patient will need certain medical procedures, such as an epidural or caesarean section ("C-section").  During the relevant time period,[1] a total of thirteen Harper/Hutzel CRNAs provided service in Hutzel's OB/Gyn unit.  The following anesthesia professionals provide the core staffing at Hutzel in the OB/Gyn department:

- Day Shift – two CRNAs, one or two anesthesiology  residents, or licensed doctors who have graduated from medical school and who are receiving specialized training in anesthesiology, and an attending anesthesiologist;

---

[1]  The statute of limitations under the FLSA is two years.  Plaintiff left DMC in February of 2010 and filed the present action in June of 2010, therefore the relevant period is June of 2008 through February of 2010.

- Afternoon Shift – two CRNAs, an attending anesthesiologist and an anesthesia resident;

- Midnight Shift – one CRNA, two anesthesiology residents and an attending anesthesiologist.

The vast majority of a CRNA's duties at Hutzel include epidurals, C-Sections, and various supporting activities related to those procedures.  An epidural is a procedure that involves placement of a catheter into the epidural space for a patient in labor, to alleviate pain.   After placement, registered nurses monitor the epidural and an anesthesia professional is called if there is a problem with an epidural. This follow-up may take anywhere from a half an hour to a full hour.  The average time it takes for placing an epidural is forty-five minutes.  CRNAs also provide anesthesia during C-sections, which generally take sixty to ninety minutes.  Defendant regularly compiles statistics on the number of procedures performed in the Hutzel OB/Gyn unit.  For instance, the average number of epidurals and C-Sections for an 8-hour shift totaled:

- Average number of epidurals per 8-hour shift: 3.16 for 2008 and 3.13 for 2009.

- Average number of C-sections per 8-hour shift: 1.37 for 2008 and 1.49 for 2009.

CRNAs may also need to conduct a preoperative interview of the patient prior to administering the anesthesia.  Additionally, CNRAs perform rounds once a day, typically during the day shift.  This can take anywhere from thirty to forty-five minutes.  CRNAs also assist in preparing the operating rooms with anesthesia medications, which takes roughly thirty minutes.

-3-

During the relevant time period, CRNAs recorded their time using the honor system, recording their "time in" and "time out" for each shift on time sheets, which were handed in every two weeks.   In July of 2008, DMC implemented the Kronos timekeeping system. Under this system, most hourly employees began electronically "punching in and out" to record the precise times they began and ended their shifts.  However, DMC did not require CRNAs to punch in and out on the Kronos system.  Rather, they continued to allow CRNAs to keep track of their time in and out by recording it on weekly time sheets, and their supervisor, the Director of Anesthesia Services, Laura Shepard, would later collect the CRNAs' time sheets and enter their time in and time out into the Kronos system.   All hourly employees working a shift longer than five hours are allowed a thirty minute uncompensated meal break.  The meal break policy states as follows:

>   A.   The meal period must be scheduled and/or approved by supervision. Supervision will try to set meal times at the middle of the shift.
>   B.   Meal periods are not considered as time worked and will not be compensated.  If a scheduled meal period is missed, compensation for time worked or equivalent time off within that shift must be provided.

See Def.'s Mot. for Summ. J., Ex. F.  DMC's meal break policy has been posted on the DMC website and is accessible to all employees.  CRNAs often work shifts longer than eight hours, sometimes working sixteen or twenty-four hour shifts.  During the longer shifts, only thirty minutes is deducted for a meal break no matter how many meal breaks are taken.  During her deposition, plaintiff testified that she had no knowledge regarding DMC's meal break policy.

There is a sizeable room located in the OB/Gyn unit where anesthesia professionals can relax when not attending to patients, referred to as "the Anesthesia Room."  CRNAs

-4-

can use the Anesthesia Room to eat, sleep or attend to personal matters.  Within the large Anesthesia Room are two smaller private rooms with couches, each of which has a door that can be closed for privacy, where a CRNA can lie down and rest or sleep.

DMC employees are required to wear a photo identification badge with an electronic strip unique to the badge owner.  A DMC employee parking garage is gated with badge swipe stations.  To enter or exit the facility, an employee must use their badge to "swipe in" or "swipe out."  Plaintiff's badge swipe activity from March 1, 2008 through February of 2010 has been collected in a report.  See Def.'s Mot. for Summ. J., Ex. N.  The report shows that for the majority of plaintiff's shifts she either arrived late or left early or, on many occasions, both.  Id. The report shows that plaintiff was paid for time that she did not actually work. Id.  For instance, from June 1, 2008 through June 14, 2008, plaintiff was paid for 260 minutes that she did not work, from October 18, 2008 through October 31, 2008 she was paid for 462 minutes that she did not work. Id.

In February of 2010, anesthesia residents complained about certain OB CRNAs, including plaintiff, leaving their shifts early.  Shepard conducted an investigation of all of the CRNAs and found that eight out of the fifty CRNAs working at Harper/Hutzel were serious offenders.  All eight, including plaintiff, submitted resignations.   In April of 2010, DMC began requiring all CRNAs to electronically punch in and out like other hourly employees.

Plaintiff filed the instant action on June 7, 2010.  On July 15, 2010, defendant filed its answer and its first amended counter-complaint, raising the following claims: Count I: Fraudulent Misrepresentation, Count II: Negligent and/or Innocent Misrepresentation, Count III: Breach of Fiduciary Duty, Count IV: Unjust Enrichment, Count V: Payment by Mistake

of Fact.  The parties have filed cross motions for summary judgment and their arguments have been fully briefed.   For the reasons stated below, defendant is entitled to summary judgment on plaintiff's claim under the FLSA for her failure to establish a genuine issue of material fact exists as to this claim.  The court declines to exercise pendent jurisdiction over the parties' remaining state law claims and dismisses these claims without prejudice.

III.    LAW & ANALYSIS

A.  Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986); see also, Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding,

241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also, National Satellite Sports, Inc. *v.* Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

B.  Cross Motions for Summary Judgment

i.   FLSA

The FLSA requires employers to pay minimum wages and overtime pay. See 29 U.S.C. §§ 206, 207.  Specifically, non-exempt employees must be paid for all hours worked and time and a half for any work performed in excess of forty hours per week.  See Wood v. Mid-America Management Corp., 192 Fed. Appx. 378, 381 (6th Cir. Aug. 1, 2006) (quoting Acs v. Detroit Edison Co., 444 F. 3d 763, 764-65 (6th Cir. 2006)).  This latter requirement was enacted, in part, "to compensate those who labored in excess of the statutory maximum number of hours worked for the wear and tear of extra work . . . ." Bay

-7-

Ridge Operating Co. v. Aaron, 334 U.S. 446, 460 (1948). .  Plaintiff has the burden of establishing "by a preponderance of the evidence that [] she was not properly compensated." Wood, 192 Fed. Appx. at 380 (citing Myers v. Copper Cellar Corp., 192 F. 3d 546, 551 (6th Cir. 1999).  Additionally, plaintiff must demonstrate that DMC "knew or should have known that s[he] was working overtime . . . ." Id. at 381.

In her motion for summary judgment, plaintiff argues that there is no genuine issue of material fact as to DMC's liability under the FLSA.  Plaintiff claims that DMC's actions in automatically deducting one half an hour of compensation for meal breaks each shift without ensuring that plaintiff actually received these breaks, as well as DMC's failure to maintain accurate records for time worked, violates federal law.  Plaintiff claims that the OB CRNAs never took their thirty minute meal breaks and sometimes arrived or stayed past the end of their shifts, but always reported only the shift they were scheduled to work, not the time they actually worked.   Plaintiff claims that all meal breaks were not 'bona fide' breaks as set forth in 29 C.F.R. § 785.19(a) because she was on call at all times during her meal break, therefore she was not relieved of her duties and must be compensated.

Conversely, DMC argues that time clocks are not required under the FLSA and the CRNAs entry of hours worked on weekly time sheets, later entered by Shepard into the Kronos system, does not violate the FLSA.  DMC maintains that plaintiff provides no evidentiary support for her assertion that she did not receive her thirty minute meal breaks each shift, to the contrary, the evidence shows that plaintiff had ample time to take a thirty minute meal break and much more.  DMC further argues that even if plaintiff could present some evidence that she was not able to take her thirty minute meal breaks, there is an absence of factual support showing that Shepard knew, or had reason to know that plaintiff

was not receiving her meal breaks.

The court agrees that plaintiff is not entitled to summary judgment on her claim under the FLSA, and that DMC is entitled to summary judgment on this claim.  To the extent plaintiff argues that DMC's failure to compensate her for the thirty minute meal break deprived her of overtime pay, such an argument is unavailing.  For many of the weeks during the relevant time period plaintiff was not scheduled to work forty hours, therefore plaintiff has no claim under the FLSA for these weeks.  See 29 U.S.C. § 207; Davis v. Food Lion, 792 F. 2d 1274, 1276 (4th Cir. 1986).  Additionally, the record reveals that plaintiff was paid more hours than she actually worked.  For nearly every single work week during the relevant time period, plaintiff's individually recorded "time in" and "time out", later entered into the Kronos system by Shepard, did not reflect the actual hours she worked, resulting in compensation for work she did not actually perform.  See Def.'s Mot. for Summ. J., Ex. N.

Therefore, even if the court found that her thirty minute meal periods were improperly deducted, she fails to show that she "performed work for which [] she was not properly compensated." Wood, 192 Fed. Appx. at 380.  This is true even for those weeks that plaintiff did work forty hours or more.  For example, plaintiff worked a total of forty hours, one sixteen hour shift, and one twenty-four hour shift, the week commencing on April 27, 2008.  See Def.'s Mot. for Summ. J., Ex. N at 5.  Shepard would have deducted two thirty-minute meal breaks from her pay check for that week.   While plaintiff's time records reflect that she worked forty hours that week, plaintiff's badge swipes for the DMC parking garage show that plaintiff left both shifts early and was over compensated for a total of one hundred and sixty two (162) minutes.  Id.  Even if the sixty minutes worth of

-9-

meal break deductions were improper under the FLSA, plaintiff was nonetheless over paid by one hundred and two (102) minutes the week of April 27, 2008. Therefore, plaintiff cannot show that she worked more than forty hours nor that she was not properly compensated under the FLSA.

In any event, plaintiff cannot show that DMC violated the FLSA by automatically deducting one half an hour of pay per shift for meal breaks because she has presented no evidence that she did not receive her thirty minute, uninterrupted meal breaks.  Plaintiff relies on 29 C.F.R. § 785.19(a) in support of her argument that her meal breaks are compensable because she was not relieved of her duties:

> Bona fide meal periods are not work time.  Bona fide meal periods do not include coffee breaks or time for snacks.  These are rest periods.  The employee must be completely relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period.  A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

29 C.F.R. § 785.19(a).

However, the Sixth Circuit has expressly held that the Department of Labor's Interpretive Bulletins are to be "accorded varying degrees of deference . . . a court is [not] legally bound by these bulletins, [they] only [] must be given some deference." Myracle v. General Electric Co., No. 92-6716, 1994 U.S. App. LEXIS 23307, *21 (6th Cir. Aug. 23, 1994).  In this circuit, the standard for determining whether meal breaks are compensable was set forth in Hill v. United States,751 F. 2d 810, 814 (6th Cir. 1984).  The Hill court held:

> As long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA.

-10-

Id.   Thus, the standard in this circuit is not "completely relieved from duty" as plaintiff argues, but whether the employee "performs substantial duties and spend[s ] her meal time predominantly for [DMC]'s benefit."  "[I]t is the employee who bears the burden of proving that he or she performs substantial duties and spends his or her meal time predominantly for the employer's benefit."  Myracle, 1994 U.S. App. LEXIS 23307, *13.

       In Myracle, the plaintiffs brought an action claiming that General Electric violated the FLSA for its failure to pay them for their twenty minute meal break.  Myracle, 1994 U.S. App. LEXIS 23307, *1.  The plaintiffs were skilled maintenance mechanics responsible for the operation of complex machinery that manufactured light bulbs or lamps used in the dashboards and turn signals of automobiles.  Id. at *2-3.  The Myracle court affirmed the district court's conclusion that the mechanics were "substantially relieved of their duties during their meal breaks and that the unpaid meal period does not constitute 'work' within the meaning of the FLSA."  Id. at *2.

       The facts in Myracle demonstrated that the mechanics were still responsible for product being manufactured during their meal breaks and that General Electric prohibited the mechanics from eating on the plant floor and provided a cafeteria and several break rooms where meals could be eaten.  Id. at *5.  Several of the mechanics testified that their meal periods were often interrupted by power outages, machine breakdowns or supervisor inquiries.  Id.  They further indicted that they were subject to discipline if the product quality or quantity was negatively impacted during their meal break.  Id.  Despite these facts, the Myracle court concluded that the employees did not perform substantial duties during their meal periods, holding:

       Plaintiffs are free to choose the time and place of their meal periods.  Further,

-11-

they are neither required nor allowed to perform their duties during this time. To the extent that plaintiffs are occasionally interrupted by an emergency or power outage, these interruption are *de minimus* and do not render the meal period compensable.

                    *                    *                    *

To require an employer to compensate employees for time when, as here, the employees cannot show that they performed any duties, much less substantial ones, during their meal periods, penalizes the employer for maintaining production on a twenty four [hour] basis.  So long as the employee receives a sufficient period of time in which to eat his meal undisturbed and unhasseled, the dictates of the FLSA are satisfied.

Id. at *16-17.

Plaintiff has failed to meet her burden showing that she performed substantial duties and spent her meal time predominantly for DMC's benefit.  Myracle, 1994 U.S. App. LEXIS 23307, *13.  Plaintiff has failed to point to any shifts during the relevant time period where she did not have enough time to take an uninterrupted, thirty-minute meal break.  For each shift, there are at least three anesthesia professionals working in the OB/Gyn unit, an attending anaesthesiologist and either two OB CRNAs or an OB CRNA and an anesthesia resident.   This was adequate staffing to cover the patient caseload and allow the OB CRNAs to take their meal breaks.  Plaintiff described at her deposition that the OB anesthesia providers equitably shared the workload.  In fact, plaintiff claimed that the anesthesia residents "frequently" told her "it's not busy or residents are up here, you have coverage, why don't you go ahead and go."  See Def.'s Mot. for Summ. J., Ex. 12 at 135.

Other anesthesia professionals aver that the anesthesia team in the OB/Gyn unit work together, sharing the workload and providing coverage during meals.  Qingyun Ruan, a CRNA for ten years, indicates that the anesthesia providers at Hutzel "work cooperatively

-12-

. . . to ensure that we receive proper meal breaks.  We will let one another know when we are taking a meal break so that if a patient issue arises the other anesthesia professional can cover it.  I do not recall an OB shift in which I did not get an uninterrupted 30-minute break."  See Dec. of Qingyun Ruan at ¶ 19.  Vitaly Soskin, M.D., who regularly worked with plaintiff in the OB/Gyn department, declares that:

> Based on my years of interactions with Ms. Deppen, it has been my observation that she, as well as the other CRNAs, was regularly able, during their shifts, to take at least a 30-minute uninterrupted break and often much more.

See Dec. of Vitaly Soskin, ¶ 9.  Likewise, Timothy Bialobrzeski, D.O., an anesthesiology resident from 2007 through 2010 who regularly worked and interacted with plaintiff and the other CRNAs, confirms that, with respect to the shifts he worked alongside plaintiff, "there was substantial down time, and Ms. Deppen was regularly able to take breaks that often lasted well in excess of 30 minutes."  Id., ex. 7 at § 9.  Other staff who worked with plaintiff in the OB/Gyn unit confirm that plaintiff had plenty of time to take a thirty minute meal break during her shifts.  Carmen Schlitt, the charge nurse having overall responsibility for the OB/Gyn floor, avers that:

> Ms. Deppen regularly had substantial "down time" during her shifts, during which she had no patient responsibilities.  Ms. Deppen was regularly able, during her shifts, to take at least a 30-minute uninterrupted break and often much more.  Ms. Deppen would take her break in a room away from the surgical areas, where Ms. Deppen could eat, attend to other personal matters, or lie down and rest or sleep in a bed provided for that purpose.

Id., Ex. 5 at ¶ 6.

Additionally, plaintiff's clinical records show that she had enough time during her shifts to take an uninterrupted meal break.  For instance, on May 26, 2009, plaintiff worked the midnight shift, from 11:00 p.m. through 7:30 a.m.  She performed two epidurals, which

-13-

took an estimated two hours.[2]  Time estimates for other OB CRNA duties which may or may not have been required during this shift, such as preoperative interviews (fifteen minutes each), follow-up on the two epidurals (forty-five minutes each) starting difficult IVs (fifteen to thirty minutes each) that the registered nurses could not perform, post-operative rounds (thirty to forty-five minutes) and prepping the operating room (thirty to forty-five minutes), total at the most five hours if every duty took the longest possible amount of time. Therefore, on May 26, 2009, plaintiff had time to take her thirty minute meal break.

Review of other shifts shows the same result: plaintiff had plenty of time to take a thirty-minute meal break, if not more.  On August 18, 2009 through August 19, 2009, plaintiff worked a sixteen-hour shift.  During this shift, plaintiff started two epidurals and provided anesthesia for 1 C-Section.  Allowing one hour for each of the clinical procedures, results in a total clinical time of three hours.  Estimates for plaintiff's other duties, including pre-operative interview for the C-Section (fifteen to thirty minutes), starting one to two difficult IVs (fifteen to thirty minutes each ), follow up for the epidurals (forty-five minutes each), post-operative rounds (thirty to forty-five minutes) and prepping the operating room (thirty to forty-five minutes) would equal at most five to six additional hours of work for a total of an estimated nine out of sixteen hours spent on clinical procedures and other CRNA duties.   Plaintiff has failed in her burden of introducing evidence that she performed substantial duties and spent her meal period predominantly for DMC's benefit.  Myracle, 1994 U.S. App. LEXIS 23307, *13.

---

    [2] An hour block of time is estimated for performing an epidural procedure, however this is a generous estimate, as plaintiff testified that an uncomplicated epidural could be started in twenty minutes.  See Def.'s Mot. for Summ. J., Ex. 12 at 140.

Plaintiff also argues that DMC's failure to keep accurate time records, including documenting when meal breaks were taken, shifts the burden from plaintiff to the DMC to prove that plaintiff took her meal breaks.  Plaintiff's theory rests on the notion that DMC must require CRNAs to punch in and punch out instead of keeping track of their time and turning in their time sheets to Shepard.  This misrepresents the applicable regulations, which state that "[t]ime clocks are not required."  29 C.F.R. § 785.48.  DMC did have proper time keeping mechanisms in place, specifically the CRNAs would keep track of their work hours each day on weekly time sheets and Shepard later recorded this information into the Kronos system.  This is sufficient under the FLSA.  See 29 C.F.R. § 785.46, see also, 29 C.F.R. § 516.2(a)(7).

Plaintiff relies on U.S. Dept. of Labor v. Cole Enterprises, 62 F. 3d 775, 779 (6th Cir. 1995) in support of her argument that DMC's failure to maintain accurate records of employee work hours and breaks shifts the burden from plaintiff to DMC to prove that the breaks were taken.  In Cole Enterprises, the court found that the district court did not err in requiring the employer to prove that the minimum wage was paid for all hours worked by the employees.  Id.  In so concluding, the Sixth Circuit Court of Appeals relied on the fact that  the owners of the restaurant told the employees to record only their scheduled shifts on their time sheets, and not the actual hours they worked.  Id.  Additionally, the employees had presented sufficient evidence demonstrating that they had, in fact, performed work for which they were not compensated.  Id.  Therefore, it was appropriate for the district court to shift the burden of proof to the employer because the evidence revealed that the employers failed to keep accurate records of the actual time worked by the employees.  Id.

-15-

Here, there is no evidence that the CRNAs were told to record only their scheduled shifts as opposed to the hours they actually worked.   There is no evidence in the record that the CRNAs were told by Shepard or any DMC administrator to record only their scheduled hours rather than the hours they actually worked.  To the contrary, the record evidence demonstrates that other CRNAs recorded their early starts or late exits and not just their scheduled shifts on their time sheets and were compensated accordingly.  <u>See</u> Dec. of Laura Shepard, Exs. E, at 8, 19, and H at 6. Thus, there is no basis for this court to shift the burden to DMC requiring it to prove that plaintiff took her meal breaks.

Additionally, plaintiff is incorrect in her assertion that the FLSA requires employers to ensure that their employees are receiving their meal breaks whenever an automatic deduction for meal breaks is taken.  Plaintiff cites to no statute, regulation, or case law which requires employers to document break time.  Rather, plaintiff relies on an non-precedential, unpublished opinion, <u>Hamelin</u> v. <u>Faxon-St. Luke's Healthcare</u>, No. 08-CV-1219, 2009 U.S. Dist. LEXIS 9793 (N.D. N.Y.  Jan. 26, 2009) in support of her argument. However, <u>Hamelin</u> does not hold that employers are required to keep a record of employees' meal breaks.  In <u>Hamelin</u>, the district court was presented with the question of whether the action should proceed as a collective action under 29 U.S.C. § 216(b). <u>Hamelin</u>, 2009 U.S. Dist. LEXIS 9793, * at 2.  In  <u>Hamelin</u>, the plaintiffs alleged "that defendant's polices and practices of making automatic meal deductions coupled with their . . . require[ment] that its employees do not sacrifice patient care  in order to take their meal breaks and that they perform work during their breaks[]" violates the FLSA .  <u>Hamelin</u>, 2009 U.S. Dist. LEXIS 9793, *at 18, 21.  The <u>Hamelin</u> court noted that "the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal

-16-

breaks in and of itself does not violate the FLSA" but rather it was the fact "[t]hat administrators at Faxton-St Luke's [we]re aware that employees [we]re performing compensable work through scheduled meal breaks . . . that potentially runs afoul of the Act." Hamelin, 2009 U.S. Dist. LEXIS 9793, * at 18, 20-21.

In this case there is no evidence that the CRNAs were required and expected to work through their meal breaks, or that Shepard or any other DMC administrator had knowledge that they were working through their meal breaks. Hamelin was in its infancy when the court ruled in favor of the plaintiff's request to proceed as a collective action, there was no determination as to whether the employer was liable under the FLSA. Hamelin, 2009 U.S. Dist. LEXIS 9793, * at 32-35. This matter is before the court on the parties' summary judgment motions, and plaintiff must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank, 391 U.S. at 270. Plaintiff has failed to come forward with evidence demonstrating that there are genuine issues for trial on her FLSA claim. Defendant is entitled to summary judgment on plaintiff's claim under the FLSA.

ii.    Pendent Jurisdiction

There are no remaining claims arising under the United States Constitution or federal law. Therefore, this court must determine whether it should exercise its discretion to exert jurisdiction over plaintiff's remaining state law claims and DMC's state law counterclaims. This court may exercise its pendent jurisdiction over the remaining state law claims if (1) it has authority to hear the claims and (2) determines, in its discretion, that the exercise of jurisdiction over these claims will further the policies behind the doctrine of pendent jurisdiction. See United Mine Workers v. Gibbs, 383 U.S. 715 (1966). A district

-17-

court's resolution of "state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties." <u>Carnegie-Mellon University</u> v. <u>Cohill</u>, 484 U.S. 343, 349-50 (1988).  The Gibbs court advised that if all of the federal claims are dismissed prior to trial, the remaining state law claims should also be dismissed. <u>Gibbs</u>, 383 U.S. at 726.  Thus, this court's finding of summary judgment in DMC's favor on plaintiff's FLSA claim results in an absence of a basis for exercising pendent jurisdiction over this actions remaining state law claims.

IV.    <u>CONCLUSION</u>

Accordingly,

DMC's motion for summary judgment [#37] is GRANTED IN PART.   Plaintiff's claim under the FLSA is dismissed.

Plaintiff's motion for summary judgment [#42] is DENIED.

The remaining state law claims are dismissed without prejudice.

This action is dismissed.

SO ORDERED.

Dated:  July 19, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 19, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk